PEOPLE v HOUSTON

Docket No. 96068. Argued November 3, 1994 (Calendar No. 3). Decided March 22, 1995. Rehearing denied *post,* 1231.

John H. Houston was convicted by a jury in the Wayne Circuit Court, Michael J. Talbot, J., of first-degree criminal sexual conduct involving his fourteen-year-old cousin. The Court of Appeals, MACKENZIE, P.J., and SAWYER and JANSEN, JJ., in an unpublished opinion per curiam, remanded the case, directing the court to articulate on the record its reasons for departing from the sentencing guidelines and imposing a sentence of twenty-five to fifty years (Docket No. 117039). On remand, the court, Richard L. Cunningham, J., after articulation, again imposed a sentence of twenty-five to fifty years. After remand, the Court of Appeals affirmed in an unpublished opinion per curiam. The defendant appeals.

In an opinion by Justice BOYLE, joined by Justices RILEY, MALLETT, and WEAVER, the Supreme Court *held:*

The defendant's sentence does not violate the requirements of *People v Milbourn,* 435 Mich 630 (1990); the sentencing judge did not violate the defendant's attorney-client privilege.

1. The case at bar presents neither the maximum nor minimum sentence, and thus *Milbourn* directs courts to consult the second edition of the Michigan Sentencing Guidelines as an aid to determining the proportionality of the sentence. Under *Milbourn,* the key test of proportionality is not whether the sentence departs from or adheres to the recommended range, but whether it reflects the seriousness of the matter. Thus, it is possible that a sentence within the guidelines range could be disproportionately high or low. In the absence of factors legitimately considered at sentencing and not adequately considered by the applicable guidelines, a departure from the recommended range indicates a possibility that a sentence may be disproportionate. However, *Milbourn* did not state or establish that any factors accounted for in the guidelines had been adequately considered or appropriately weighed. The *Milbourn* Court repeatedly observed that sentencing judges are not required to adhere to the guidelines. Judges may impose sentences higher than the guidelines' range when that range is too low. Unless there is some basis for deciding what range would

have been appropriate, it cannot reliably be concluded that the sentence was disproportionate. By allowing departures when the guidelines consideration of a particular factor is not adequate, *Milbourn* permits sentencing judges to reweigh the guideline variables and remove the distortions induced by a classification system that is, by necessity, overly simplistic.

2. In this case, the trial judge did not err in finding that the recommended range was inadequate to reflect the seriousness of this offense; thus, the sentence imposed satisfies the proportionality requirement of *Milbourn*. In addition, assuming arguendo that the guidelines range is adequate to reflect the seriousness of the offense, the sentence did not constitute an abuse of discretion because the offense involved circumstances not accounted for in formulating the guidelines, and circumstances that were inadequately accounted for in the guidelines. It is clear that the guidelines do not reflect certain variables that a sentencing judge properly may consider. Further, with respect to the current guidelines, it is not known which variables were considered or what weight was accorded them. Thus, it cannot be said that this offense and this offender are in fact comparable to the situation within the applicable grid cell of the guidelines.

3. The defendant waived any claim to privilege. The defendant challenged, as violative of his attorney-client privilege, inquiries directed by the trial court to appellate defense counsel on remand about whether the defendant's trial counsel had consulted with the defendant, and why so many witnesses had testified at the *Ginther* hearing. The inquiries immediately followed allegations by the defendant that counsel had not consulted him about critical decisions, thus making it necessary for the court to address the issue. While a court must carefully evaluate statements made by a defendant and protect the attorney-client privilege where appropriate, it is not required to stand idle in the face of claims that counsel made decisions without consulting the defendant. In this case, however, the defendant made the principal decisions involved in the conduct of his *Ginther* hearing. The trial court was not required to let stand statements on the record, unexamined and unrebutted, that would have resulted in another remand to the trial court for another hearing about the effectiveness of appellate counsel.

Affirmed.

Chief Justice BRICKLEY, joined by Justice LEVIN, dissenting, stated that it is the extent of the trial court's departure from the sentencing guidelines, as opposed to the mere departure, in this case that constitutes an abuse of sentencing discretion.

While the sentencing judge based his discretionary departure from the guidelines on some reasons not already encompassed by the guidelines, his other reasons consisted of factors already encompassed by the guidelines and were of sufficient importance and significance to lead to the conclusion that the extent of departure from the guidelines resulted in a disproportionate sentence. Thus, the sentence should be held to be invalid, and the case remanded for resentencing.

Justice CAVANAGH, joined by Justice LEVIN, dissenting, stated that the trial court abused its discretion in imposing a disproportionate sentence, because the extent of its departure from the sentencing guidelines' recommended minimum sentence was not supported by the reasons it gave.

A sentencing court that departs from the sentencing guidelines must clearly articulate its reasons for doing so, and must explain why those reasons warrant the extent of the departure. If the court is relying on reasons that are already accounted for in the sentencing guidelines or are already an element of the particular offense, it must explain how those reasons have not been fully accounted for in the sentence that the guidelines recommend.

A sentencing court should not summarily disregard the sentencing guidelines. The second edition of the guidelines does not fail to recognize the seriousness of criminal sexual conduct. Every forcible sexual assault inflicts lasting psychological harm, and the recommended ranges reflect a recognition of the life-altering nature of this offense. In this case, the trial judge revealed a disdain for the guidelines in general. He failed to explain how the situation in this case exceeds in seriousness the plight faced by every victim of a forcible sexual assault, nor did he explain why the exploitation by the defendant was extraordinary in its degree.

Because the trial judge failed to adequately explain how some of the reasons that he relied on were not sufficiently accounted for, it appears that the primary remaining reason for sentence departure was the defendant's prison misconducts. This factor alone would not justify the extent of the departure. Thus, because some of the trial judge's reasons may amount to legitimate departure reasons with a more sufficient explanation of why those reasons are more extreme than the statutory offense and the guidelines reflect, the case should be remanded for further articulation of the reasons.

Justice LEVIN, dissenting, stated that while some departure from the guidelines would have been warranted, provided the sentencing judge had adequately explained his reasoning, the

sentence imposed on the defendant, who had no prior record, was disproportionate under *Milbourn.*

In *Milbourn,* the Supreme Court held that sentences were reviewable under the principle of proportionality, derived from legislation providing more severe punishments for more severe crimes and for offenders with prior convictions. The Court held that the trial court appropriately exercises the discretion left to it by the Legislature not by applying its own philosophy of sentencing, but by determining where, on the continuum from the least to the most serious situations, an individual case falls and by sentencing the offender in accordance with that determination. However, an informal review of a sampling of applications to the Supreme Court for leave to appeal reveals that few defendants received sentences as long as the defendant's. In general, higher sentences were imposed only where a sexual assault: included a physical assault causing physical injury to the victim; involved a victim under the age of puberty, often as young as five, or an elderly victim; was committed by a defendant with a record of prior criminal activity, including prior criminal sexual conduct convictions, a long-term pattern of sexual abuse of the victim, or with a close familial relationship with the victim.

In this case, while the defendant was related to the victim by blood, he did not generally reside in the household. The victim was fourteen years old, and thus had reached puberty and was considerably older than most of the victims in the reviewed cases. The defendant did not have a history of sexual abuse involving the victim, nor did he have any prior criminal record. While the victim suffered psychological trauma, as would almost any victim of a sexual assault, she was not subjected to physical injury.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Research, Training and Appeals, and *Robert A. Radnick* and *Carolyn M. Breen,* Assistant Prosecuting Attorneys, for the people.

State Appellate Defender (by *David A. Moran*) for the defendant.

Amicus Curiae:

*James K. Robinson* for Wayne State University Law School.

BOYLE, J. The defendant challenges his sentence on the grounds that the sentence is disproportional and that the trial court violated the attorney-client privilege. We find that the defendant's sentence does not violate the requirements of *People v Milbourn,* 435 Mich 630; 461 NW2d 1 (1990), and that the sentencing judge did not violate the defendant's attorney-client privilege. Therefore, we affirm the decision of the Court of Appeals.[1]

I

FACTS

Upon discovering that the mother of his three female first cousins would be out of town at a funeral, the defendant persuaded the oldest cousin to allow him to spend the night with them in their home. The girls had been told by their mother not to let anyone in. When the defendant arrived late in the evening, the fourteen-year-old complainant was already asleep on the living room couch, her bed. Following several hours of conversation between the defendant and the complainant's two older sisters, aged eighteen and sixteen respectively, and the eighteen-year-old's departure to the hospital with a sick child, the defendant was left alone to sleep on the living room floor. Sometime thereafter, the defendant placed a pillow over his sleeping fourteen-year-old cousin's face, pulled

---

[1] The prosecution urges us to address the question whether sentence guidelines violate the separation of powers, Const 1963, art 4, § 45, and exceed the scope of judicial power, MCL 769.1(1); MSA 28.1072(1). Justice RILEY and I have indicated our view that the guidelines do not establish substantive rights for defendants. See *People v Polus,* 447 Mich 952 (1994) (BOYLE and RILEY, JJ., dissenting from denial of leave to appeal).

down the girl's pants, and proceeded to penetrate her vaginally.

Part of this assault was witnessed by the complainant's sixteen-year-old sister, who entered the living room in response to the noise of something falling. Once there, she observed the defendant, naked from the waist down, on top of the victim, holding a pillow over her face.[2] When she asked the defendant what he was doing on top of her sister, he replied, "I don't know," and "I ain't doing nothing to her." The sister went back to her bedroom.[3] Later, the victim, crying, came into the bedroom, told her sister that "John Henry had raped her." They went into the bathroom to wash out the victim's underwear, which "had white stuff" in them.

The defendant never admitted his guilt, contending that the victim fabricated the offense for reasons known only to herself. Moreover, the defendant testified at trial that many of the incriminating statements he gave to the detective in charge of the case that bore his signature were incorrectly transcribed because both he and the detective were "half asleep."

The jury took one hour to convict the defendant of first-degree criminal sexual conduct. Finding the guidelines range of six to ten years inadequate, the trial judge sentenced the defendant to twenty-five to fifty years in prison.

The Court of Appeals remanded the case to allow the defendant to challenge his sentence and trial counsel's effectiveness. The successor judge, Richard Cunningham, held an evidentiary hearing over five days on these issues that fills 221 pages.

---

[2] The victim testified that she screamed. It seems logical that the purpose of the pillow was to muffle these cries for help.

[3] The witness explained to the jury that she went back to bed because there was nothing she could do.

Defendant called several family members in support of the claim that the trial attorney should have placed them on the stand. The testimony may be fairly summarized as irrelevant to the issue of commission of the offense, as indicating that the incident had caused substantial difficulty in the family because defendant's supporters refused to accept defendant's guilt, and as having been presented at the defendant's request. At the conclusion of that lengthy hearing, Judge Cunningham rejected the defendant's claim that counsel had been ineffective, and "acting independently of Judge Talbot's decision," again sentenced the defendant to twenty-five to fifty years in prison.

Judge Cunningham noted that the defendant had received eleven major misconduct tickets during his time in prison. He also concluded that a witness called by the defendant, a former fellow inmate, was lying when he testified that he, not defendant, had started all the fights leading to the misconduct tickets. The judge also noted the defendant's absolute lack of regard for the victim and lack of remorse for the crime.

The sentencing information report listed the following reasons for departure:

(1) In general, the guidelines for CSC offenses fail to adequately address the seriousness of the crime. Guidelines are based upon actual sentences imposed during a time prior to the "feminist movement's" success in having society in general, and judges in particular, recognize the "special" nature of such crimes.

(2) The guidelines fail to take into account the family relationship between the actor and the victim.

(3) This is a resentencing. The guidelines fail to take into account the eleven prison misconducts by this defendant since the original sentence.

(4) Guidelines fail to take into account defendant's absolute lack of remorse and low potential for rehabilitation.

(5) Guidelines are not sufficient to reflect the very high degree of exploitation in this case.

The Court of Appeals affirmed this judgment of sentence. The Court affirmed the decision that trial counsel had not been ineffective, rejected defendant's argument that the judge forced appellate counsel to violate the attorney-client privilege, and held that defendant's sentence was proportionate to the seriousness of the offense. Unpublished opinion per curiam, issued January 13, 1993 (Docket No. 117039) (after remand). This Court granted the defendant's application for leave to appeal. 445 Mich 880 (1994).

## II

### LEGALITY OF THE DEFENDANT'S SENTENCE

The defendant challenges the validity of his sentence under *People v Milbourn, supra,* in which this Court held that some sentences that fall within the legislatively prescribed range may nevertheless be illegally long or short. According to *Milbourn,* a trial court abuses its discretion when it imposes a sentence that is not "proportional" to the seriousness of the matter.

Under *Milbourn,* the maximum sentence for a given offense is proportionate where the circumstances surrounding the offense place it in the most serious class with respect to the particular crime. *Id.* at 654; see also *People v Merriweather,* 447 Mich 799; 527 NW2d 460 (1994).

The case at bar presents neither the maximum nor minimum sentence, and thus *Milbourn* directs courts to consult the second edition of the Michi-

gan Sentencing Guidelines as an aid to determining the proportionality of the sentence. Under *Milbourn,* the "key test" of proportionality is not whether the sentence departs from or adheres to the recommended range, but whether it reflects the seriousness of the matter. Thus, it is possible that a sentence within the guidelines range could be disproportionately high or low. 435 Mich 661.

In the absence of factors legitimately considered at sentencing and not adequately considered by the applicable guidelines, a departure from the recommended range indicates a possibility that a sentence may be disproportionate. *Id.* at 657, 661. However, *Milbourn* did not state or establish that any factors accounted for in the guidelines had been adequately considered or appropriately weighed. As we have recently noted, "[n]either the grids nor *Milbourn* dictate that a departure from guidelines is to be arithmetically measured to determine the propriety of a given sentence." *Merriweather, supra,* 447 Mich 808. The United States Court of Appeals for the First Circuit expressed the same concept in *United States v Ocasio,* 914 F2d 330, 336 (CA 1, 1990), in these words:

> Although some other courts have, from time to time, suggested formulaic approaches to assessing the reasonableness of particular departures, . . . . we are wary of such pat answers.

In *Milbourn,* the Court repeatedly observed that sentencing judges are not required to adhere to the guidelines. The majority explained that "the guidelines may not be a perfect embodiment of the principle of proportionality," 435 Mich 661, that they "do not have a legislative mandate," *id.* at 656, and that "requir[ing] strict adherence to the guidelines would effectively prevent their evolution," *id.* at 657.

In the instant case, the trial judge found that the recommended range was inadequate to reflect the seriousness of this offense. We agree with the finding and conclude that the sentence imposed satisfies the proportionality requirement of *Milbourn*.

In addition, assuming arguendo that the guidelines range is adequate to reflect the seriousness of the offense, we find that the sentence did not constitute an abuse of discretion because the offense involved circumstances not accounted for, or accounted for inadequately, in formulating the guidelines.

### A. THE SERIOUSNESS OF THE CRIME

Judge Cunningham explained that he imposed a sentence higher than the range set by the Sentencing Guidelines Advisory Committee because that range is too low:

> We have seen what I find to be ridiculously low guidelines in the offense of Criminal Sexual Conduct in the First Degree, just in general.

The observation is well taken. For example, for a defendant who had no prior convictions and who raped a victim at knife point but did not actually cut or inflict permanent injury on his victim, the guidelines would recommend a one-year minimum sentence as appropriate.[4]

For this defendant, who raped a fourteen year old by putting a pillow over her face, the guideline sentence—two to eight years—is so stunningly low that the trial judge could only think of one explanation:

---

[4] Cell I-A on the grid for first-degree CSC recommends a minimum sentence between twelve and seventy-two months.

> I think that the guidelines for this offense reflect a time when young women were treated as property, when this wasn't considered a very serious offense at all.

While the accuracy of this statement is debatable, that does not undermine the conclusion that the range is too low.

*Milbourn* specifically contemplated that judges could impose sentences higher than the guidelines' range when that range is too low:

> [T]rial judges may continue to depart from the guidelines when, in their judgment, the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime. [*Id.* at 657.]

For the majority, Justice BRICKLEY[5] wrote:

> [T]he key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range. [*Id.* at 661.]

While we agree with the trial judge's conclusion that the recommended range is too low, the issue is not whether we agree with the trial court's selection of an appropriate sentence.[6] Unless there is some basis for deciding what range would have been appropriate, we cannot reliably conclude that the sentence was disproportionate.

### B. FACTORS NOT CONSIDERED BY THE GUIDELINES

Alternatively, Judge Cunningham pointed to

---

[5] In this case, however, Chief Justice BRICKLEY would determine that the sentence is disproportionate without addressing this question.

[6] The *Milbourn* majority noted that "[s]uch trial court decisions remain, of course, subject to review in accordance with this opinion." *Id.* at 657, n 25.

three aggravating factors that were not accounted
for in the guidelines. First, he found that the
guidelines fail to account for the family relation-
ship between the defendant and the victim. The
*Milbourn* majority considered any such prior rela-
tionship an archetype justification for departure:

> In some cases, there may be important sentenc-
> ing factors that are not included in the sentencing
> guidelines. Perhaps the clearest example of such a
> factor is the prior relationship, if any, between the
> victim and the offender. [*Id.* at 660.]

The trial judge found the relationship to be an
aggravating factor.

Second, the judge considered the fact that the
defendant received eleven misconduct tickets in
prison before being resentenced. Misbehavior after
arrest is clearly a legitimate factor to consider at
sentencing. *Texas v McCullough,* 475 US 134; 106
S Ct 976; 89 L Ed 2d 104 (1986); *People v Mazzie,*
429 Mich 29, 35; 413 NW2d 1 (1987) (opinion of
BRICKLEY, J.); *id.* at 43-47 (BOYLE, J., concurring in
part and dissenting in part). The guidelines do not
account for misconduct in custody. However, just
as an exemplary custodial record might be found
to be a mitigating circumstance, misconduct in
custody may be an aggravating circumstance indi-
cating a disposition to violence or impulsiveness.

Third, the judge found that the guidelines failed
to account for the "defendant's absolute lack of
remorse and low potential for rehabilitation." Both
factors are legitimate considerations in determin-
ing a sentence. See *People v Wesley,* 428 Mich 708;
411 NW2d 159 (1987) (lack of remorse); *People v
Snow,* 386 Mich 586, 592; 194 NW2d 314 (1972)
(potential for rehabilitation).

In addition, although not referenced in the sen-

tencing information report, the judge specifically found on the record that the inmate produced at defendant's request had lied. In imposing sentence, a trial court may consider a defendant's own perjury where there is a rational basis in the record for concluding that the defendant wilfully made a flagrantly false statement on a material issue. *People v Adams,* 430 Mich 679; 425 NW2d 437 (1988). Within constitutional limits, the federal sentence guidelines provide for upward sentence enhancement where a defendant wilfully suborns untruthful testimony during "a sentencing proceeding." USSG § 3C1.1; Hutchinson & Yellen, Federal Sentencing Law & Practice (2d ed), pp 485-487.

Finally, by the time the *Ginther*[7] hearing was concluded, the defendant was making allegations that his appellate attorney, who served him commendably in difficult circumstances, was also ineffective.

### C. FACTORS CONSIDERED WITHIN THE GUIDELINES

The sentencing judge also pointed to a factor that he felt was considered inadequately: the high degree of exploitation of the victim. The record presents a pattern of exploiting family relationships that began with defendant going to the home on the night in question and continued throughout the evidentiary hearing. Producing family members to testify who had no information relevant to the charge could have been reasonably viewed by the sentencing court as continued exploitation of the victim by dividing the family over the incident. As the trial court expressly observed in response to defense counsel's claim regarding the effect on the victim:

---

[7] *People v Ginther,* 390 Mich 436; 212 NW2d 922 (1973).

That would be absolutely no value to me coming
from these people. I'll tell you why. Because it's
very clear to me that the concern here is with Mr.
Houston, it is no way at all to that young woman. -
So, A, I would find I would have a concern about
the believability of it. But B, I can find where that
young woman's going to have to suppress around
her family anything that she feels, she can't let
out anything she feels about this incident because
of the lack of support she's been given.

The dissent's assertion that the guidelines range
"already reflected a family relationship between
the defendant and the victim," *post* at 345, over-
looks the fact (apparent in the trial court testi-
mony and the testimony at the evidentiary hear-
ing) that the familial relationship alluded to was
not simply the relationship between the victim
and the defendant. Moreover, the trial judge's
view agreed with the Legislature's view of the
seriousness of the offense. The Legislature recog-
nized that a familial relationship between the
victim and the offender is an aggravating factor
and established that, by virtue of the family rela-
tionship, the crime in question is "punishable by
imprisonment in the state prison for life or for any
term of years." MCL 750.520b(2); MSA 28.788(2)(2).

### D. ANALYSIS OF THE SENTENCE

In summary, the record reflects that the trial
court considered defendant's exploitation of the
victim, postcustody misconduct, absolute lack of
remorse, production of perjured testimony, and
exploitation of the family relationship as reasons
for the sentence imposed. Contrary to the dissent's
assumption, the guidelines furnish no reliable ba-
sis for the Court to conclude that defendants pre-
senting similar patterns would have been sen-

tenced within the guidelines range of two to eight years.

It is likely, although not provable, that a defendant found guilty by a jury of CSC I who failed to express remorse while not expressly denying guilt, engaged in substantial subsequent misconduct, exploited the family relationship, and produced testimony found to be perjurious would be sentenced in the range of the highest twelve and one-half percent of sentences the guidelines do not reflect.[8]

It is likely, although again not provable, that the guidelines range of two to eight years represents to some significant degree cases disposed of with explicit or implicit sentence concessions. Federal guidelines data, for example, indicate that guilty pleas, on average, result in considerably lower sentences, thirty to forty percent lower than what would have been imposed had the defendant been convicted at trial.[9] If one assumes that some portion of the pool of sentences falling into the range of two to eight years was imposed as a result of waiver trials, it is again likely that this defendant was not in fact similar to others within that grid. Taking these considerations together in light of our experience that the vast majority of defendants express remorse after conviction, it is highly likely that the guidelines' ranges reflect sentences of those who have received systemic sentence concessions and demonstrated potential for rehabilitation by expressing remorse. In short,

---

[8] For each cell of the guidelines, the committee excluded from the recommended range approximately the highest and lowest twelve and one-half percent of actual sentences given. Consequently, the range in each cell of the guidelines reflects approximately seventy-five percent of the actual sentences studied by the committee.

[9] United States Sentencing Commission, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements (1987), p 48. Data from Detroit Recorder's Court indicate for the period 1992 through 1994 that less than five percent of cases were disposed of by jury trial.

given that the guidelines treat the same real offenses differently depending on the method of disposition, we have no ground in the guidelines for concluding how other judges would have addressed this defendant's situation.

By allowing departures when the guidelines consideration of a particular factor is "not adequate," *Milbourn* allows sentencing judges to reweigh the guideline variables. It is through this process that the trial judges can remove the distortions induced by a classification system that is, by necessity, overly simplistic. The data that form the basis for the range within each cell have been filtered[10] through the point system formulated by the Sentencing Guidelines Advisory Committee. While compilation of empirical data and considerations about ease of use required a relatively simple methodology, application of that methodology to concrete cases can be very questionable.[11]

---

[10] The understanding that "[t]he guidelines represent the actual sentencing practices of the judiciary" is essential to any colorable claim of authority to require adherence to the guidelines under any circumstances. See *Milbourn,* 435 Mich 656. There would seem to be no question at all that this Court could not set any sentence or sentence range that it deemed appropriate for a given offense. Under our constitution, authority to establish sentences rests with the Legislature. Const 1963, art 4, § 45. The Legislature, in turn, has conferred authority to determine individual sentences upon trial courts alone:

> A judge of a court having jurisdiction is authorized and empowered to pronounce judgment against and pass sentence upon a person convicted of an offense in that court. The sentence shall not be in excess of the sentence prescribed by law. [MCL 769.1(1); MSA 28.1072(1).]

It is only the fact that the constraint on discretion by *Milbourn* is ostensibly rooted in actual sentences imposed by circuit judges that gives this Court even the slightest claim of authority to declare void as too high sentences that fall within the legislatively prescribed range.

[11] For example, for first-degree criminal sexual conduct, a defendant would receive twenty-five offense points if the victim broke her arm. By itself, twenty-five points would place the offender in offense level III.

We can assume that there are other cases of intrafamilial sexual assaults that produce such intrafamily conflicts, that there are sentences based on subsequent custodial misconduct, that there are cases where the defendant's sentence reflects a trial court's finding of lack of regard, for the victim, and lack of remorse, including the production of perjured testimony. It is entirely possible that defendants like Mr. Houston, who have been found guilty by a jury of taking advantage of younger relatives, receive much higher sentences than the great number of other defendants regardless of which cell they fall into. If this were the case, those sentences would not be reflected in the guideline ranges on the assumption that they make up only a small percentage of CSC I convictions. However, we have no way of knowing to what extent, if at all, and where outside the guidelines range trial courts might sentence such defendants. Thus, the sentencing guidelines range is simply inapplicable to Mr. Houston.

### III

#### THE POSITION OF THE DISSENTING OPINION

We reject the dissent's conclusion that the trial court's considerations were already factored into and accounted for by the Criminal Sexual Conduct Guidelines. Cf. *post* at 344. To suggest that the trial judge must establish to what extent the guidelines variables do not fully account for sen-

---

A different offender could also receive twenty-five points by pointing a gun at the victim and then discharging it without injuring the victim, five points if the victim sustained serious psychological injury necessitating professional treatment, and ten points for being the leader if the rape involved a gang of defendants. This total of forty points would also place defendant at offense level III. Assuming he had the same prior record as the first defendant, this very different offender would also fall within the same range.

tencing factors is to impose on the trial court an obligation to prove that something is not what it does not purport to be. Trial courts would be required to demonstrate not only that the situation is dissimilar to others, but how dissimilar it is. Such an impossible burden would effectively prevent the evolution of guidelines.

There is no basis for the dissent's assumption that the guidelines "adequately" account for the factors and weights assigned. The guidelines assign a numerical weight to certain variables on the assumption that these weights approximate what trial judges were doing in the cases within the statistical base. The committee properly and specifically disclaimed any suggestion that it had properly weighed the variables identified.[12] Thus, we are unable to conclude that the variables identify and assign the proper weight to any given factor that any judge, many judges, or most judges would assign.

From our analysis it is clear that the guidelines do not reflect certain variables that a sentencing judge may properly consider. Further, as the guidelines presently exist, no one knows for certain which variables were considered, or what weight was accorded them. Thus, it cannot be said

[12] The committee did not regard the original guidelines as adequately assessing offenders in a given cell grid as in fact being similar to each other, and revised the guidelines to attempt to reflect factors of greater or lesser importance in judicial decision making. McComb, *An overview of the second edition of the Michigan Sentencing Guidelines,* 67 Mich B J 863, 864 (1988). The committee's goal was to reflect the current practice of "the majority" of judges during a given period. However, the second edition of the guidelines did not purport to reflect that the weight-assigned variables adequately accounted for the significance of given factors in a given sentence.

Under the federal sentence guidelines scheme, the sentencing commission has been given legislative authority to determine guidelines, 28 USC 994(a). The variables used to score the guidelines are thus "adequate" to reflect congressional intent because they were enacted by Congress.

that this offense and this offender are, in fact comparable to the situation within the applicable grid cell of the sentencing guidelines.

IV

### THE ATTORNEY-CLIENT PRIVILEGE

The defendant contends that resentencing is required because the court violated his "attorney-client privilege when it ordered defense counsel to reveal that Mr. Houston had insisted on calling witnesses to his *Ginther* hearing." We reject this claim because the defendant waived his privilege.[13]

At issue are inquiries directed to appellate defense counsel about whether he had consulted with his client and why so many witnesses had testified at the hearing. Contrary to the defendant's contention that the reason for the inquiry was to determine whether defendant himself had caused such a lengthy hearing, it is clear that the question was directed to the adequacy of counsel's representation and the implicit suggestion that counsel's deficiencies had deprived defendant of a meaningful hearing. These inquiries immediately followed allegations by the defendant that counsel "did not come and talk to me and see me," and had not consulted him about critical decisions. The judge questioned defense counsel about the truth of these allegations.[14]

---

[13] Because of our resolution of this issue, we need not decide whether a violation of the defendant's attorney-client privilege at sentencing would require resentencing.

[14] In the defendant's articulation, he again asserted that his trial attorney, Mr. Black, did not adequately represent him. After the defendant completed his statement, the following exchange took place:

*The Court:* If there was any problem between you and Mr. Black, it wasn't his ineffectiveness, sir. It was your inability to

listen to your attorney, your inability to comport yourself in the courtroom. You know everything. You're going to tell everybody, you're going to tell Mr. Shrewsbury, you're going to tell Mr. Black, you're going to tell the Court. I have seen that type of behavior from you here. It even leads me to believe stronger that you did not suffer any ineffective assistance by Mr. Black. You made Mr. Black's job extremely difficult.

*Defendant Houston:* May I speak?

*The Court:* Continue.

*Defendant Houston:* You said I made Mr. Black's job worse and difficult. No, I did not. Mr. Black did not represent me. I do not fault Mr. Dennis Shrewsbury if he done his job, but Mr. Dennis Shrewsbury, he did not come and talk to me and see me. That's the same way Mr. Black done to me in 1987. They made decisions without talking to me. I come in the courtroom and all of a sudden everything come at me at one time. What do I supposed to do? I'm trying to talk to him. I didn't get harsh with him. This is my life on the line and I have a right to consult with my attorney, but there's a time and place to consult with your attorney, not in the courtroom all at one time, man. Your attorney is supposed to come and see you and talk with you about things, but when you come in the courtroom and everything come at you at one time . . .

*The Court:* Okay, Mr. Houston, stop right there. Mr. Shrewsbury, this is probably the longest evidentiary hearing I've ever held. In that regard, sir, have you had occasion to talk to Mr. Houston during any of these many, many proceedings, have I given you the opportunity to have private conversations with him or is Mr. Houston accurate when he says that he did not have time to consult with you?

*Mr. Shrewsbury:* I have talked to Mr. Houston. I have not seen him in the jail. I have talked to him here in the court and in the lock-up.

*The Court:* And the number of times we're here in the court and lock-up, was there any reason to see him in the jail?

*Mr. Shrewsbury:* I guess that's a matter of opinion, Your Honor.

*The Court:* In your opinion?

*Mr. Shrewsbury:* Do I have to answer that?

*The Court:* Yes sir.

*Mr. Shrewsbury:* Your Honor, I didn't see any other need to discuss other problems or other parts of the case except what we did here in court.

*The Court:* In your professional opinion, sir, just in your own professional opinion, was there a need to call all these witnesses that you called or were you doing that, sir, just because your client insisted it be done?

*Mr. Shrewsbury:* Your Honor, I think that there was a need to call the witnesses.

*The Court:* All of them?

*Mr. Shrewsbury:* No.

As Wigmore explains, a client's allegation that an attorney breached his duty to the client waives the attorney-client privilege:

> There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or to disclose, but after a certain point his election must remain final. As a fair canon of decision, the following distinctions may be suggested:
>
> * * *
>
> (6) When the client alleges a breach of duty to him by the attorney, the privilege is waived as to all communications relevant to that issue. [8 Wigmore, Evidence (McNaughton rev), § 2327, pp 636-638.]

The fact that the defendant's allegation was not brought in a formal complaint against his attorney is of no consequence. In *Leverich v Leverich,* 340 Mich 133, 137; 64 NW2d 567 (1954), a divorce case in which the attorney was not a party, this Court noted that "[a]fter the wife claimed to the court that she had received from her attorney improper advice as a result of which she agreed to the property settlement, and she had testified in relation to such claim, it was proper and competent for the attorney to testify as to the advice he gave her."

The defendant's claim on the record that his

---

*The Court:* And many of them were called at Mr. Houston's insistence?

*Mr. Shrewsbury:* Your Honor, I think that Mr. Houston had an honest belief that these witnesses were helpful to him.

*The Court:* All right. I'm ready to pass sentencing. Thank you. You may sit down, Mr. Houston. All right.

attorney had not spoken with him made it necessary for the court to address the issue. While a court must carefully evaluate the statements made by a defendant and protect the privilege where appropriate, it is not required to stand idle in the face of claims that counsel made decisions "without talking to me." The truth was the defendant himself was making the principal decisions involved in the conduct of the *Ginther* hearing. The trial court was not required to let stand statements on the record, unexamined and unrebutted, that would have resulted in another remand to the trial court for a hearing, this time about the effectiveness of appellate counsel. Consequently, the defendant waived any claim to privilege by making this allegation.[15]

For the foregoing reasons, we affirm the decision of the Court of Appeals.

RILEY, MALLETT, and WEAVER, JJ., concurred with BOYLE, J.

BRICKLEY, C.J. (*dissenting*). I concur with the general rule posited by Justice CAVANAGH, as I understand that rule to be: A sentence that departs from the recommended guidelines is not necessarily disproportionate if the judge's reasons for departure consist of factors not already encompassed by the guidelines. The rule posited by Justice CAVANAGH not only recognizes that the guidelines fail to account for the multitude of variables surrounding a particular offense and offender, but also provides a workable method by which trial courts and appellate courts can uphold proportionality in sentencing.

---

[15] The dissent offers no support for the assertion that the judge "treaded dangerously close to violating the defendant's attorney-client privilege." *Post* at 350.

While I agree with the rule postulated by Justice CAVANAGH, I do not concur in part III of his opinion, because most of the reasons for departure articulated by the trial judge do not consist of factors already encompassed by the guidelines. Thus, it is the extent of departure from the guidelines, as opposed to the mere departure, that constitutes an abuse of sentencing discretion in this case.

I

The sentencing judge specifically identified the reasons upon which he based his decision to depart from the sentence guidelines for first-degree criminal sexual conduct. Unlike the majority, I confine my review to those reasons that are specifically identified on the sentencing record and in the departure evaluation form. To speculate, as the majority does, that reasons other than those identified by the sentencing judge, motivated his decision to depart from the guidelines, defeats the purposes of requiring judges to specifically articulate their reasons for departure. See *People v Fleming,* 428 Mich 408; 410 NW2d 266 (1987).

Properly focusing on the reasons that the sentencing judge identified as the basis for his departure from the guidelines, I agree with Justice CAVANAGH that the "psychological effect [of this crime] on the victim" and "exploitation of the victim" are factors already encompassed by the criminal sexual conduct sentencing guidelines and were insufficient reasons for departure.[1] I also

---

[1] "Psychological injury to the victim" is encompassed by offense variable 13 and "offender exploitation of victim" is encompassed by offense variable 7. Michigan Sentencing Guidelines (2d ed).

In *People v Milbourn,* 435 Mich 630, 660, n 27; 461 NW2d 1 (1990), we recognized that in extraordinary occasions, a factor already encompassed by the guidelines would, nevertheless, also be a factor justifying departure from the guidelines:

agree that the sentencing judge's general dissatisfaction with the guidelines is not in itself a legitimate reason for departing from the guidelines. If those three reasons had been the only basis for the judge's departure from the sentencing guidelines, then there would be no need for me to write separately. However, the sentencing judge identified other reasons that I believe are not encompassed by the guidelines and which merit further consideration.

The sentencing judge identified the defendant's eleven prison misconducts as a reason for departure. Because prison misconduct is a relevant sentencing consideration, not encompassed by the guidelines, the judge did not abuse his discretion by considering it.

Similarly, the family relationship between the defendant and the victim was a relevant sentencing consideration not encompassed by the criminal sexual conduct guidelines. *People v Milbourn,* 435 Mich 630, 660-661; 461 NW2d 1 (1990). At least in the context of a first-degree criminal sexual conduct offense, it is not sufficient to say that because a factor, such as family relationship, was an element of the offense, it necessarily is encompassed by the guidelines. In contrast to other offenses, a conviction for first-degree criminal sexual conduct may be premised on eight distinct theories, all of which are punishable by imprisonment for life or any term of years, many of which would not require

---

[T]here will be occasions when the conduct or the criminal record to be scored under the sentencing guidelines is extraordinary in its degree, and thus beyond the anticipated range of behavior treated in the guidelines.

This case simply is not one of those cases in which the effect on the victim and degree of exploitation are so extraordinary or egregious that even the highest score on the offense variable would be insufficient to reflect the conduct. For an example of such a case, see the facts of *People v Merriweather,* 447 Mich 799; 527 NW2d 460 (1994).

a family relationship. See MCL 750.520b(1)(a)-(h);
MSA 28.788(2)(1)(a)-(h). Because the relevant
sentencing guidelines do not distinguish be-
tween first-degree criminal sexual conduct with a
family member and other types of first-degree
criminal sexual conduct, they offer no guidance in
resolving the question what sentence, within the
statutorily prescribed range, is suitable to this
offender who in perpetrating this offense sexually
forced himself upon a young family member. In
fact, the family relationship between the victim
and the defendant would seem especially pertinent
here, where that relationship facilitated the perpe-
tration of the crime. Accordingly, consideration of
the relationship between the defendant and the
victim was not an abuse of sentencing discretion.

The sentencing judge also identified the defen-
dant's "low rehabilitative potential" as a reason
for departure from the guidelines. While the rec-
ord is less than clear about why this defendant is
regarded as having low potential for rehabilita-
tion, an individual's potential for rehabilitation
generally is a legitimate sentencing consideration,
not already encompassed by the guidelines. *People
v Snow,* 386 Mich 586, 592; 194 NW2d 314 (1972).
Therefore, it was not an abuse of sentencing dis-
cretion to consider that factor.

The defendant's apparent lack of remorse is also
not a factor considered by the guidelines. However,
under the facts of this case, I cannot conclude that
remorse was a proper consideration. Following the
defendant's allocution in which he repeatedly as-
serted his innocence, the sentencing judge ex-
plained its finding of remorselessness as follows:

> First of all, I'm extremely concerned by your
> lack of remorse. Now, certainly you are protesting
> your innocence, and you have every right to pro-

test your innocence and I will not hold that
against you in any way. But I do see among—I see
in you, sir, an absolute failure to accept responsi-
bility for your behavior and absolute disregard for
the concern about other people. I see now a desire
only for yourself, an absolute disregard for that
young woman that was hurt. I was very concerned
about that, no remorse whatsoever in what you
did.

While the sentencing judge paid lip service to the
defendant's right to assert innocence, it is obvious
that the judge's finding of remorselessness was
based merely on the defendant's assertion of inno-
cence. Therefore I cannot conclude that remorse-
lessness was a proper sentencing consideration in
this case. In *People v Yennior*, 399 Mich 892
(1977), this Court held: "A court cannot base its
sentence even in part on a defendant's refusal to
admit guilt." A majority of this Court reaffirmed
*Yennior* and explained that reliance on a defen-
dant's assertion of innocence is not a proper sen-
tencing consideration if it appears that "had the
defendant affirmatively admitted guilt, his sen-
tence would not have been so severe." *People v
Wesley*, 428 Mich 708, 713, 725; 411 NW2d 159
(1987).[2]

On the basis of the record in this case, it ap-
pears that had the defendant admitted guilt, his
sentence would not have been as severe because
the perceived lack of remorse, on which this sen-

---

[2] Justice ARCHER's opinion, joined by Justice GRIFFIN, identified
three factors that would indicate that a sentence was likely to have
been improperly influenced by the defendant's persistence in his
innocence: "(1) the defendant's maintenance of innocence after convic-
tion, (2) the judge's attempt to get the defendant to admit guilt, and
(3) *the appearance that had the defendant affirmatively admitted
guilt, his sentence would not have been so severe.*" *Id.* at 713.

Justice LEVIN and I expressed our opinion that a sentencing judge
could properly consider those factors "which exist apart from a
defendant's continued assertions of innocence." *Id.* at 725.

tence was partly based, would have been lacking. Therefore, in accord with the majority view expressed in *Wesley,* I would conclude that the sentencing judge was improperly influenced by the defendant's persistent assertion of innocence.

In this case, any attempt to distinguish the defendant's continued assertion of innocence from his lack of remorse would be an illusory effort designed to justify a sentence that would have been less severe if the defendant had affirmatively admitted his guilt. Nothing in *Yennior* or *Wesley, supra,* compels such sophistry.

## II

While the sentencing judge based his discretionary departure from the guidelines on some reasons not already encompassed by the guidelines, his other reasons consisted of factors already encompassed by the guidelines and were of sufficient importance and significance to lead me to conclude that the extent of departure from the guidelines in this case resulted in a disproportionate sentence. Accordingly, I would find the sentence to be invalid, and would remand for resentencing.

Levin, J., concurred with Brickley, C.J.

Cavanagh, J. (*dissenting*). The defendant was convicted by a jury of first-degree criminal sexual conduct[1] and was sentenced to a term of twenty-five to fifty years. The Court of Appeals affirmed after a remand at which the same sentence was imposed. The defendant argues that the trial court abused its sentencing discretion by imposing a disproportionate sentence. I would hold that the trial court abused its sentencing discretion by

---

[1] MCL 750.520b(1)(b)(ii); MSA 28.788(2)(1)(b)(ii).

imposing a disproportionate sentence, because the extent of the departure from the sentencing guidelines' recommended minimum sentence was not supported by the reasons given by the trial court. Therefore, I would vacate the sentence.

I

A jury found that the defendant had engaged in forcible sexual intercourse with his fourteen-year-old cousin, while spending the night of March 5, 1987, at her home. At the July 1987 trial, the victim testified that she had been asleep on the couch when the defendant placed a pillow over her face and penetrated her vaginally. The defendant denied any sexual misconduct.

The trial judge departed from the guidelines' recommended minimum range of six to ten years, and sentenced the defendant to a term of twenty-five to fifty years imprisonment. The court later denied a delayed motion for new trial.

On appeal, the Court of Appeals remanded the case to the trial court for two purposes.[2] First, the trial court was to conduct a *Ginther*[3] hearing to consider the defendant's claim of ineffective assistance of trial counsel. Second, if the trial court determined that the trial counsel had not been ineffective, the trial court was directed to resentence the defendant. The panel instructed the trial court to articulate on the record its reasons for departing from the guidelines, as required by *People v Fleming*, 428 Mich 408; 410 NW2d 266 (1987). Further, the panel directed the trial court to comply with the *Milbourn*[4] principle of propor-

[2] Unpublished opinion per curiam, issued February 19, 1992 (Docket No. 117039).

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[4] *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990).

tionality that had been explained by this Court in the interim between the sentencing and the remand order.

In May 1992, on remand, the original trial judge's successor conducted a lengthy *Ginther* hearing, which consumed four court sessions over a six-week period. The court rejected the defendant's claim of ineffective assistance of counsel and immediately resentenced him.

The judge first scored the offense variables under the sentencing guidelines. He scored offense variable 7, Offender Exploitation of Victim Vulnerability, the maximum fifteen points.[5] In doing so, the judge stated:

It would be hard for me to imagine a more exploitive situation. We have testimony . . . indicating that the victim, 14 years old, is at her home. Her parents are gone. They're out of town to attend the brother's funeral and the young woman's granddaddy's funeral. And while they're

---

[5] The sentencing guidelines provide for scoring ov 7, Offender Exploitation of Victim Vulnerability, as follows:

15 Offender exploits the victim due to a physical disability, mental disability, youth, agedness, or an abuse of authority status

5 Offender exploits the victim through a difference in size/ strength, or because the victim was intoxicated, under the influence of drugs, asleep, or unconscious

0 No exploitation

Instructions

A. The mere existence of one or more of these factors should not automatically be equated with victim vulnerability.

B. Exploitation refers to the manipulation of the victim for selfish or unethical purposes.

C. Vulnerability refers to the readily apparent susceptibility of the victim to injury, physical restraint, persuasion, or temptation.

D. Abuse of authority status refers to situations where a victim is exploited out of fear or deference to an authority figure (e.g., parent-child, doctor-patient). [Michigan Sentencing Guidelines (2d ed), p 45.]

gone, this defendant, Mr. John Henry Houston, exploits the family relationship to get in the door, to even get in the home. The young woman was told by her parents not to let anybody in while they were gone. . . . And he gets in only because the way he exploits and used the family relationship. He exploits and uses that relationship to get close to that young girl, to get her to trust him. He uses and exploits that relationship to be in a situation where he can ultimately grab the pillow, put it over her face while he rapes her there on the floor in her own home. He uses the great difference in their size and age to carry that out. He exploits the fact that he's so much bigger and she's got nowhere to cry for help. I can't think of a more exploitive situation than this man who weasels his way and exploits his way into the home of that young girl, waits until they can get alone and then takes her physically against her will right there in the home of her own—in [sic] the floor of her own home. I'm giving 15 points only because I can't give any more.

The judge then determined that the guidelines recommended a minimum sentence of between twenty-four and ninety-six months. However, he again imposed the sentence of twenty-five to fifty years.

After remand, the Court of Appeals affirmed the sentence, finding that it was proportionate under *Milbourn.*[6]

II

In *Milbourn,* this Court found "shocks the conscience"[7] to have been an unsatisfactory formulation of the standard for reviewing sentences. Rather, we explained that a sentencing court

---

[6] Unpublished opinion per curiam, issued January 13, 1993 (Docket No. 117039).

[7] *People v Coles,* 417 Mich 523; 339 NW2d 440 (1983).

abuses its discretion if it imposes a sentence that is not "proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Milbourn,* 435 Mich 630, 636; 461 NW2d 1 (1990). We drew this conclusion by examining the work of the Legislature, which sets the parameters of judicial sentencing discretion. It cannot be doubted that the Legislature intends judges to apply a principle of proportionality, when it is evident that such a principle has informed and guided the Legislature's own decisions in the area of sentencing. *Id.* at 650-651.

In *Milbourn,* we further explained that the second edition of the Sentencing Guidelines reflects an attempt to parallel this principle of proportionality scheme. Recognizing the limitations of the guidelines, however, we noted that a departure from the guidelines would be appropriate in a situation in which the guidelines did not adequately reflect legitimately considered circumstances of the particular offender and the seriousness of the particular offense. *Id.* at 657. We cautioned that a sentencing court's failure to give adequate reasons for such departures, and for the extent of such departures, should signal the appellate court that the sentence may be disproportionate. *Id.* at 659-660. By approving departures based on ambiguous reasons, the appellate court risks the danger of allowing the sentencing judge to improperly consider factors twice.

The instant case presents an opportunity to refine further our *Milbourn* discussion on departures from the sentencing guidelines. I would hold that a sentencing court that departs from the guidelines must clearly articulate its reasons for doing so, and must explain why those reasons warrant the *extent* of the departure. Most importantly, if the court is relying on reasons that are

already accounted for in the sentencing guidelines or are already an element of the particular offense, I would hold that the court must explain how those reasons have not been fully accounted for in the sentence that the guidelines recommend. In *Milbourn,* we noted that

> there will be occasions when the conduct or the criminal record to be scored under the sentencing guidelines is extraordinary in its degree, and thus beyond the anticipated range of behavior treated in the guidelines. [*Id.* at 660, n 27.]

However, I believe the sentencing court should not cover the same ground twice.

### III

We now turn to the guidelines departure in this case. On the sentencing information . report (SIR) departure evaluation form, the trial court listed five reasons for departure outside the recommended range:

> (1) In general, the guidelines for CSC offenses fail to adequately address the seriousness of the crime. Guidelines are based upon actual sentences imposed during a time prior to the "feminist movement's" success in having society in general, and judges in particular, recognize the "special" nature of such violent crimes.
> (2) The guidelines fail to take into account the family relationship between the actor and the victim.
> (3) This is a resentencing. The guidelines fail to take into account the eleven prison misconducts by this defendant since the original sentence.
> (4) Guidelines fail to take into account defendant's absolute lack of remorse and low potential for rehabilitation.

(5) Guidelines are not sufficient to reflect the very high degree of exploitation in this case.

At the resentencing, the judge further commented on his departure reasons. In doing so, he revealed a disdain for the guidelines in general.

> Let me begin by saying that I find these guidelines to be totally inaccurate—inadequate in regard to the situation. Guidelines are historical and guidelines are based upon what sentences have been given in the past, and I think that the guidelines for this offense reflect a time when young women were treated as property, when this wasn't considered a very serious offense at all. We have seen what I find to be ridiculously low guidelines in the offense of Criminal Sexual Conduct in the First Degree, just in general.

The defendant contends that the judge impermissibly discarded the guidelines merely because he disagreed with them in general. The defendant cites *Milbourn,* and *People v Schnepp,* 185 Mich App 767; 463 NW2d 183 (1990), for the proposition that a trial judge may not simply disregard the guidelines. I agree. In *Milbourn* at 656, we stated that the second edition of the sentencing guidelines was the best "barometer" for sentencing a given case. Further, the second edition better reflects *current* sentencing practices, and, therefore, it should be used as the starting point for sentencing. The sentencing court should not summarily disregard the guidelines altogether.

Regarding the sentencing judge's contention that the guidelines reflect archaic attitudes toward sexual assault, the defendant reminds us that the second edition of the sentencing guidelines went into effect in 1988, long after the criminal sexual

conduct act[8] took effect. I am unable to join the judge in supposing that the 1988 second edition of the guidelines reflects a failure of the state's judiciary, as late as the mid-1980s, to recognize the seriousness of criminal sexual conduct.

The trial court also based departure from the guidelines on the defendant's blood relationship with the victim. The prosecutor and the defendant both state that the blood relationship was the element of the charge that elevated the crime to first-degree criminal sexual conduct.[9] The defendant further argues that had the defendant *not* been related to the victim, the maximum that he could have been convicted of was third-degree criminal sexual conduct.[10] The defendant contends that the guidelines range would then have been twelve to twenty-four months. He argues that, in *this case,* the blood relationship, in and of itself, raised the applicable guidelines range to twenty-four to ninety-six months. I would agree. I believe that the recommended range of minimum sentences for *this defendant,* in *this case,* already reflected a family relationship between the defendant and the victim. I do not believe that the trial judge explained how this elevated range did not sufficiently account for the blood relationship factor.

During resentencing, the judge also commented

---

[8] 1974 PA 266, as amended, MCL 750.520a *et seq.;* MSA 28.788(1) *et seq.*

[9] The criminal sexual conduct statute provides that a defendant is guilty of first-degree criminal sexual conduct if: 1) there is penetration, 2) the victim is at least thirteen years old, but less than sixteen years old, and 3) the defendant "is related to the victim by blood or affinity to the fourth degree." MCL 750.520b(1)(b)(ii); MSA 28.788(2)(1)(b)(ii).

[10] The criminal sexual conduct statute provides that a defendant is guilty of third-degree criminal sexual conduct if there is penetration and the victim is at least thirteen years old, but less than sixteen years old. MCL 750.520d(1)(a); MSA 28.788(4)(1)(a).

on the defendant's lack of remorse, on the potential long-term psychological effect on the victim, and on his own desire to send a message to the community. I would find that the judge has not sufficiently explained how these considerations are not already reflected by the sentencing guidelines as applied to criminal sexual conduct convictions.

For instance, the court scored zero points for offense variable 13 (psychological injury to the victim), citing an insufficient record caused by the victim's failure to come forward. However, after scoring the guidelines, the trial court stated:

> I am concerned that the guidelines do not take into account long-term effects of this type of sexual assault. Certainly we have one little category that says five points if there's a psychological injury to the victim, but do we have something that's going to take into account the entire life of that 14-year-old who was raped there in her own home under these extraordinarily cruel circumstances?

The judge further rejected the attorney's attempt to add that the victim had recovered. The trial court opined that the victim was suppressing her feelings because her relatives had been unsupportive. He further explained:

> I'll take that into account, that she is leading an apparently on-the-surface normal life, but I cannot accept the fact that there is not a potential for serious psychological damage to occur, and if it hasn't exhibited any manifest signs at this point, that doesn't mean it won't occur in the future, and the possibility is one of the things that does concern me.

Every forcible sexual assault inflicts lasting psychological harm. That is one of the many reasons that the Legislature provides a maximum of life

imprisonment for first-degree criminal sexual conduct, and it is reflected in the sentences imposed by Michigan judges for this offense. The guidelines being a reflection of those sentencing practices, the recommended ranges reflect a recognition of the life-altering nature of this offense. In this case, the judge said that the victim "is leading an apparently on-the-surface normal life," but has "a potential for serious psychological damage." What is missing from the record is the judge's explanation of how this situation exceeds in seriousness the plight faced by every young victim of a forcible sexual assault.

And finally, the court based its departure from the guidelines on the very high degree of exploitation that it found in this case. I would note that the judge had already scored fifteen points for offense variable 7, based on exploitation of the victim by the defendant. My review of the record does not reveal an obvious explanation of why the exploitation by the defendant was "extraordinary in its degree, and thus beyond the anticipated range of behavior treated in the guidelines." *Milbourn* at 660, n 27. Here, the victim was asleep before the sexual assault. I would find that the trial court has not sufficiently explained how the exploitation exceeds that found in cases of first-degree criminal sexual conduct in which the family relationship is an element of the offense. Neither has the court explained its apparent conclusion that the exploitation has not been fully accounted for by scoring the maximum number of points for offense variable 7.

Because the trial judge failed to adequately explain how some of the reasons that he relied on were not sufficiently accounted for, I believe that the primary remaining reason for sentence departure was the defendant's prison misconducts. This

factor alone would not justify the extent of the departure of this case. Because some of the trial judge's reasons *may* amount to legitimate departure reasons with a more sufficient explanation of why those reasons are more extreme than the statutory offense and the guidelines reflect, I would remand for further articulation of the reasons. For these reasons, I would vacate the defendant's sentence and remand for resentencing.[11]

At the time of sentencing, this defendant was thirty-one years of age. The presentence investigation report contained this rather unremarkable evaluation:

> John Henry Houston is a 26 year old native of Birmingham, Alabama. The Houston family migrated to Detroit, MI in 1966. The defendant has some positive factors in his background including a stable upbringing and the continued support of his family. He has no youth bureau contacts or juvenile record. The instant case represents Mr. Houston's only felony conviction on his adult record. The defendant is in good health and denies a substance abuse history.
>
> There are also a number of negative features in this case. The defendant's natural parents were never legally married. The defendant's mother married Cornelius Jones in 1957 and that marriage ended in separation in 1986. The defendant fathered two children (approximately 6 years and 9 years) from different women: the defendant's mother has had legal custody of the defendant's older daughter since 1986. The defendant stated he was employed at the Mini-Mart Food Center in Detroit, Mi from 1983 to March 1987, however, per a phone conversation with the owner's son of this

---

[11] I note that ordinarily we would only remand for an articulation of the reasons justifying departure from the sentencing guidelines. See *People v Triplett*, 432 Mich 568; 442 NW2d 622 (1989). However, because this trial judge is not eligible for assignments, a remand for resentencing would be required.

mini-mart food store, the defendant last worked there in 1985. Furthermore, the defendant stated from January, 1987 to March, 1987 he held gainful employment at the Orlon's Enterprise located in Livonia, MI before quitting. The directory assistance has no listing for this company, therefore, employment could not be verified. A check with the Detroit Police Department Identification Bureau reveals that the defendant was convicted of Possession of Marijuana on March 2, 1979 before the Honorable William C. Hayes and was fined $25 or four days jail on case # T337742.

The complainant on the instant offense or her family failed to return the victim's impact statement, therefore, restitution is not recommended at this time.

The top end of the recommended guidelines range was eight years in prison. However the sentencing trial judge felt that this was far from adequate for this first-time offender. He was of the belief that for this hardly unusual intrafamily CSC offense, it was necessary to more than triple the top of the guideline range. This belief will cost the taxpayers of this state some $750,000 in prison costs before this defendant turns fifty-six years of age and serves his minimum sentence. A sentencing judge certainly has the right and obligation to protect society from violent offenders. Surely, however, the circumstances of the offense and the characteristics of the offender must be carefully balanced to protect society, to not squander the state's scarce resources and to see, for a definite, reasonable period of time, that the defendant, in a structured setting, works toward rehabilitation. His probation officer stated: "It is our feelings that his rehabilitation could best be effective in a structured setting where he would derive the maximum help." In my view, giving time like candy is irresponsible, symptomatic of a simplistic mentality

and an utter waste of the state's precious resources.

### IV

The defendant also argues that the trial court violated his attorney-client privilege at the resentencing hearing by improperly asking his attorney whether it was the defendant who had insisted on calling so many witnesses to testify at the hearing. His attorney's answer revealed that it had indeed been the defendant who had wanted the witnesses called. The Court of Appeals found no merit to this issue. My review of the record leads me to conclude that the judge asked an irrelevant question and that he treaded dangerously close to violating the defendant's attorney-client privilege. I believe that the judge was expressing his frustration with the length of the hearing. However, I do not believe that the judge used the information that he obtained to punish the defendant. Because I would remand for resentencing, I would not decide whether the defendant was prejudicially harmed by a violation of his attorney-client privilege. I disagree with the majority's holding that the defendant waived his privilege.

LEVIN, J., concurred with CAVANAGH, J.

LEVIN, J. (*dissenting*). I have signed and join in Justice CAVANAGH's and Chief Justice BRICKLEY's dissenting opinions, which focus principally on the sentencing guidelines.

I write separately to explain why I have concluded that the sentence imposed on John Henry Houston was disproportionate under the standard set forth in *People v Milbourn,* 435 Mich 630; 461 NW2d 1 (1990).

The majority states that "the sentencing guidelines range is simply inapplicable to Mr. Houston,"[1] finding that the sentencing judge articulated factors that either were not included in the guidelines scoring or not adequately weighed by the scoring charts. The majority concludes that the sentencing judge satisfied the proportionality requirement of *Milbourn,* agreeing with his finding that the recommended guideline range is "inadequate to reflect the seriousness of this offense."[2]

In *Milbourn,* this Court held that sentences were reviewable under the "principle of proportionality," derived from legislation providing more severe punishments for more severe crimes and for offenders with prior convictions.[3] This Court said, "The trial court appropriately exercises the discretion left to it by the Legislature *not* by applying its own philosophy of sentencing, but by determining where, on the continuum from the least to the most serious situations, an individual case falls and by sentencing the offender in accordance with this determination."[4] The Court concluded that, because the sentencing guidelines "represent the actual sentencing practices of the judiciary," they are "the best 'barometer' of where on the continuum from the least to the most threatening circumstances a given case falls."[5]

Quite apart from the guidelines, the sentence imposed on Houston violates the principle of proportionality set forth in *Milbourn.*

The majority's criticism of the sentencing guidelines suggests the need for a current scientific study of sentencing practices in Michigan courts to

---

[1] *Ante* at 328.

[2] *Ante* at 321.

[3] *Id.* at 650.

[4] *Id.* at 653-654 (emphasis in original).

[5] *Id.* at 656.

assist judges in review for proportionality. Our central staff, the commissioner's office, might be asked to compile sentencing information for various crimes from among the pool of applications for leave to appeal to this Court.[6]

In the absence of such a study, I have conducted an "unscientific" review of a sampling of commissioner's reports evaluating applications for leave to appeal in CSC cases in January and February 1994 and February, 1995. These over sixty cases are most likely to reflect the range of punishment imposed in circumstances resembling the instant case.

From this review, it appears that few defendants have received sentences as long as Houston's sentence of twenty-five to fifty years, and then only when one or more of the following factors were present: a physical assault, in addition to the sexual assault, causing physical injury to the victim;[7] a victim under the age of puberty, often

[6] The pool of defendants who apply for leave to appeal to this Court represents the most severe cases—generally those in which the trial court sentenced more heavily.

[7] *People v Tibbs,* No. 97523, dragged victim to bedroom, severely beat and raped her—life sentence; *People v Antonio Williams,* No. 97497, defendant raped and robbed victim in her home—30 to 50 years; *People v Ross,* No. 97722, defendant assaulted and raped victim in defendant's home—12 to 30 years; *People v Wilbon,* No. 97684, defendant went to home of former girlfriend and forced her to have sex—20 to 30 years; *People v Sandridge,* No. 97801, defendant beat and bound former girlfriend, forced her to perform fellatio, then took her to backyard in subfreezing temperatures to have intercourse—4 to 15 years; *People v Walker,* No. 97602, defendant assaulted, bound and raped former girlfriend in victim's apartment—5 to 15 years; *People v Weeks,* No. 97614, defendant forced victim into her car at knifepoint, then drove her to a secluded area where he forced her to perform fellatio, took money and drove away in victim's car—25 to 80 years on guilty plea; *People v Conklin,* No. 97771, victim was inmate in county jail where defendant, along with others, beat victim and inserted six-inch stick smeared with grease into victim's anus—20 to 90 years; *People v Lyons,* No. 97414, defendant robbed, then raped victim—25 to 40 years; *People v Holland,* No. 99914, defendant grabbed estranged wife in parking lot, dragged her to alley where codefendant was waiting, threw her into trunk of car, physically

under the age of ten or even under the age of five;[8]
an elderly victim;[9] a record of prior criminal activ-
ity, including, in some cases, prior CSC convic-

assaulted and raped victim twice at gunpoint—25 to 50 years; *People
v Michael Williams*, No. 99799, defendant participated in rape with
codefendant in *Holland*—18 to 30 years; *People v Harris*, No. 100321,
defendant followed victim home off bus, took her to a vacant building
and required her to perform fellatio and engage in intercourse at
gunpoint—25 to 50 years; *People v Martin*, No. 100494, multiple gang
rape by four men who broke into victim's house—40 to 80 years;
*People v Sandeen*, No. 100592, defendant abducted barmaid at knife-
point, drove a distance and forced her to fellate him at knifepoint—35
to 60 years; *People v Garries*, No. 100618, physical assault on victim
in her home by defendant who broke and entered—25 to 75 years.

[8] *People v Pierce*, No. 97510, six-year-old girl—5 to 10 years; *People
v Greer*, No. 97337, ten-year-old boy—10 to 20 years; *People v Perez*,
No. 97452, twelve-year-old girl—10 to 30 years; *People v Harper*, No.
97567, two victims were five- and six-year-old girls—10 to 15 years on
guilty plea; *People v Qualls*, No. 97500, ten-year-old girl—8 to 15
years on a plea of nolo contendere; *People v Santos*, No. 97651, two-
year-old girl—25 to 50 years; *People v Morofsky*, Nos. 98226, 98323,
six-year-old girl—10 to 30 years; *People v Anderson*, No. 98159, eight-
year-old son and stepbrother—6 to 15 years on guilty plea; *People v
Luckey*, No. 97530, eight-year-old girl—40 to 80 years; *People v
Duggan*, No. 98211, eleven-year-old mentally retarded boy—15 to 30
years; *People v Hill*, No. 98388, six-year-old girl—10 to 20 years;
*People v James Jones*, No. 97723, twelve-year-old boy—24 to 50 years;
*People v Heath*, No. 97484, seven-year-old girl—15 to 25 years; *People
v Fuller*, No. 97700, daughter of live-in girlfriend—30 to 60 years on
guilty plea; *People v Alderman*, No. 97260, eleven-year-old step-
daughter—10 to 20 years; *People v Vega*, No. 99747, eleven-year-old
girl—15 to 30 years; *People v Debs*, No. 100035, twelve-year-old boy—
15 to 30 years; *People v Parsons*, No. 100403, six-year-old grand-
daughter—15 to 30 years; *People v Burke*, No. 100460, three-year-old
daughter—40 to 60 years; *People v Mott*, No. 100551, three year old—
9½ to 15 years on guilty plea; *People v Walker*, No. 100542, step-
daughter from ages ten to thirteen years old—14 to 30 years on guilty
plea; *People v Nelson*, No. 100534, five-year-old cousin—11 to 30
years; *People v Saunders*, No. 100500, ten-year-old daughter—15 to 30
years on a plea of nolo contendere; *People v Abernathy*, No. 100487,
twelve-year-old daughter of girlfriend—life sentence; *People v
Glockzin*, No. 100473, five-year-old girl and ten-year-old boy—7½ to
40 years; *People v Raymond Walker*, No. 100627, six-year-old—5 to
22½ years; *People v Ritchie*, No. 100777, eight-year-old girl—30 to 60
years.

[9] *People v Smith*, No. 97615, seventy-one-year-old mentally retarded
man—15 to 22½ years on guilty plea; *People v Tibbs*, n 7 *supra*,
eighty-year-old woman—life sentence; *People v Garries*, n 7 *supra*,
eighty-seven-year-old woman—25 to 75 years.

tions;[10] a long-term pattern of sexual abuse with
the victim;[11] and a close "familial" relationship

[10] *People v Smith,* n 9 *supra,* juvenile record, two misdemeanors,
larceny in building and probation violations—15 to 22½ years on
guilty plea; *People v Clark,* No. 97419, two counts of larceny under
$100, use of firearm while intoxicated, subsequent CSC II—10 to 15
years on guilty plea; *People v Santos,* n 8 *supra,* two prior mis-
demeanors—25 to 50 years; *People v Anderson,* n 8 *supra,* juvenile
adjudication for child molestation—6 to 15 years on guilty plea;
*People v James Jones,* n 8 *supra,* CCW, UDAA, misdemeanor morals in
South Carolina—24 to 50 years; *People v Heath,* n 8 *supra,* three
felonies for uttering and publishing—15 to 25 years for CSC I, 10 to 25
years for CSC II on guilty plea; *People v Wilbon,* n 7 *supra,* drunk and
disorderly, larceny over $100, and unarmed robbery—20 to 30 years;
*People v Sandridge,* n 7 *supra,* malicious destruction of property over
$100—4 to 15 years; *People v Fuller,* n 8 *supra,* CSC I and driving
while impaired—30 to 60 years on guilty plea; *People v Lyons,* n 7
*supra,* assault and battery, CSC I, CSC II, and felonious assault in
California—25 to 40 years on CSC I, 10 to 15 years on robbery; *People
v Holland,* n 7 *supra,* CSC II and others—25 to 50 years for rape, 15 to
30 years for kidnapping, 15 to 30 years for armed robbery; *People v
Debs,* n 8 *supra,* attempted extortion, unlawful transporting of fire-
arms, and three CCWs—15 to 30 years; *People v Harris,* n 7 *supra,*
assault with intent to commit criminal sexual conduct—25 to 50
years; *People v Burke,* n 8 *supra,* five adult misdemeanors, including
assaultive crimes—40 to 60 years for CSC I and child abuse, 1st degree;
*People v Morrison,* No. 100424, assault, disorderly conduct, OUIL,
others—3 to 5 years for a plea of nolo contendere to CSC III; *People v
Mott,* n 8 *supra,* CSC I, CSC IV, and a misdemeanor—9½ to 15 years on
plea; *People v Morgan,* No. 100520, shoplifting, false pretenses, and
hindering police officer—5 to 15 years on guilty plea; *People v Corder,*
No. 100519, CSC IV and false pretenses—12 to 22½ years; *People v
Saunders,* n 8 *supra,* CSC I, breaking and entering occupied dwelling,
and numerous misdemeanors—15 to 30 years on a plea of nolo
contendere; *People v Kassa,* No. 100493, larceny—2½ to 10 years;
*People v Abernathy,* n 8 *supra,* CSC III—life; *People v Sandeen,* n 7
*supra,* three felonies and eight misdemeanors—35 to 60 years for CSC
I, life for armed robbery on guilty plea; *People v Garries,* n 7 *supra,*
malicious destruction of property, possession of LSD, and misdemean-
ors—25 to 75 years; *People v Claybron,* No. 100636, 1978 assault and
battery—5 to 15 years for CSC II on guilty plea.

[11] *People v Qualls,* n 8 *supra,* raped victim daily for six months—8
to 15 years for CSC III on a plea of nolo contendere; *People v Clark,* n
10 *supra,* repeated penetrations of stepdaughter over three-year pe-
riod—10 to 15 years for CSC II on guilty plea; *People v Linares,* No.
97581, stepsister had been abused by defendant for a period of years—
10 to 15 years on guilty plea to CSC II; *People v Luckey,* n 8 *supra,*
repeated vaginal intercourse with daughter of live-in girlfriend—40 to
80 years for CSC I, 10 to 15 years for CSC II; *People v Heath,* n 8 *supra,*
defendant engaged in over 100 instances of forced oral, digital and
vaginal penetration over three year period—15 to 25 years for CSC I,

between the defendant and the victim.[12]

In the instant case, while Houston was related to the victim by blood, he did not generally reside

10 to 15 years for CSC II on guilty plea; *People v Farnsworth,* No. 97849, defendant sexually abused daughter of ex-wife for a period of years—4 to 10 years for CSC I, 4 to 15 years for CSC II; *People v Fuller,* n 8 *supra,* defendant repeatedly sexually abused daughter of live-in girlfriend—30 to 60 years for CSC I on guilty plea; *People v Parsons,* n 8 *supra,* defendant required granddaughters to fellate him—15 to 30 years for CSC I on guilty plea; *People v Burke,* n 8 *supra,* defendant abused daughter and injured her vaginal area—40 to 60 years; *People v Matthews,* No. 100501, defendant engaged in intercourse with adult daughter and evidence indicated that this began when daughter was 12, continuing on a regular basis—15 to 22½ years; *People v Walker,* n 8 *supra,* defendant engaged in fellatio and intercourse with stepdaughter for a period of over three years—14 to 30 years for CSC I on guilty plea.

[12] *People v Greer,* n 8 *supra,* victim was defendant's wife's biological son—received 10 to 120 years; *People v Qualls,* n 8 *supra,* victim was ten-year-old daughter—received 8 to 15 years for CSC III on a plea of nolo contendere; *People v Clark,* n 10 *supra,* victim was stepdaughter —received 10 to 15 years for two counts of CSC III on guilty plea; *People v Santos,* n 8 *supra,* victim was daughter of live-in girlfriend— received 25 to 50 years; *People v Morofsky,* n 8 *supra,* victim called defendant "uncle"—received 10 to 30 years; *People v Anderson,* n 8 *supra,* victims were defendant's son and stepbrother, while visiting defendant's home—received 6 to 15 years for CSC II on guilty plea; *People v Linares,* n 11 *supra,* victim was stepsister—received 10 to 15 years for CSC II on guilty plea; *People v Luckey,* n 8 *supra,* victim was daughter of live-in girlfriend—received 40 to 80 years for CSC I, 10 to 15 years for CSC II; *People v Brown,* No. 98195, victim was daughter— received 3 to 20 years for CSC I, 3 to 15 years for CSC II; *People v Farnsworth,* n 11 *supra,* victim was daughter of ex-wife—received 4 to 10 years for CSC I, 4 to 15 years for CSC II; *People v Fuller,* n 8 *supra,* victim was daughter of live-in girlfriend—received 30 to 60 years for CSC I, second offense on guilty plea; *People v Alderman,* n 8 *supra,* victim was stepdaughter—received 10 to 20 years; *People v Vega,* n 8 *supra,* defendant was older brother of victim's girlfriend—received 15 to 30 years; *People v Parsons,* n 8 *supra,* victims were granddaughters —received 15 to 30 years for CSC I on guilty plea; *People v Burke,* n 8 *supra,* victim was defendant's daughter—received 40 to 60 years; *People v Matthews,* n 11 *supra,* victim was daughter—received 15 to 22½ years; *People v Walker,* n 8 *supra,* victim was stepdaughter— received 14 to 30 years for CSC I on guilty plea; *People v Nelson,* n 8 *supra,* victim was cousin—received 11 to 30 years; *People v Morgan,* n 10 *supra,* victim was stepson—received 5 to 15 years for CSC II on guilty plea; *People v Corder,* n 10 *supra,* victim was mentally retarded daughter—received 12 to 22½ years; *People v Saunders,* n 8 *supra,* victim was daughter—received 15 to 30 years for CSC I on a plea of nolo contendere; *People v Abernathy,* n 8 *supra,* victim was daughter of woman with whom he was living—received life sentence.

in the household. The victim was fourteen years old, and thus had reached puberty and was considerably older than most of the child victims in the reviewed cases. Houston did not have a history of sexual abuse involving the victim, nor did he have any prior criminal record. While the victim suffered psychological trauma, as would almost any victim of a sexual assault, she was not subjected to physical injury.

This is not to say that some departure from the guidelines would not have been warranted, provided the sentencing judge had adequately explained his reasoning.

The following are categorized summaries of some representative cases.[13]

---

[13] In the following cases, there was no close relationship:

*People v Perez,* No. 97452—The defendant was sentenced to ten to thirty years on three counts of CSC I. He was convicted by an Ottawa Circuit Court jury on evidence that on one occasion he had vaginal intercourse and engaged in cunnilingus with a twelve-year-old girl who was babysitting his girlfriend's children.

*People v Raymond Anthony Walker,* No. 100627—Defendant was sentenced to five to twenty-two and one-half years as an habitual offender. He was convicted by a Muskegon Circuit Court jury of a sexual assault of a six-year-old victim while he was staying at her mother's home.

*People v Ritchie,* No. 100777—Defendant was sentenced to thirty to sixty years. He was convicted by a Recorder's Court jury of CSC I on evidence that he attacked the eight-year-old daughter of the family with whom he was living. As a result, the child's hymen was perforated and she had contracted gonorrhea. The defendant had a prior armed robbery conviction and was an escapee from prison.

*People v Duggan,* No. 98211—Defendant, age fifty-four, was sentenced to fifteen to thirty years. He was convicted by a Macomb County Circuit Court jury on evidence that he forced a mentally retarded eleven-year-old boy to perform fellatio on him in the bathroom of a donut store they both regularly frequented. The defendant had a long prior criminal record.

*People v James Jones,* No. 97723—Defendant, age forty-five, was sentenced to twenty-four to fifty years as an habitual offender after a remand for resentencing by the Court of Appeals. He was convicted by a Genesee County jury of CSC I on evidence that he sexually assaulted a twelve-year-old boy with whom he had become acquainted and who spent a night in the defendant's automobile.

*People v Debs,* No. 100035—Defendant, age fifty-four, was sentenced

In the following cases, there was a familial or close relationship between the defendant and the victim, usually a young child:

*People v Alderman*, No. 97260—Defendant was sentenced to terms of ten to twenty years. He was convicted by a Lapeer Circuit Court jury of three counts of CSC I on evidence that he had sexual intercourse with his eleven-year-old stepdaughter four times during a night that the victim's younger brother was taken to the hospital by her mother.[14]

*People v Vega*, No. 99747—Defendant was sentenced to fifteen to thirty years. He was convicted by an Oakland Circuit Court jury on evidence that he raped the eleven-year-old friend of his sister on two occasions at his home.

*People v Hill*, No. 98388—Defendant was sentenced to ten to twenty years. The victim was a six-year-old friend of her daughter. Defendant was convicted by a Macomb County jury of CSC I on evidence that she penetrated the victim's vagina with her finger while the victim was sleeping at the defendant's home.

---

to fifteen to thirty years. He was convicted in Recorder's Court of one count of CSC I on evidence that he forced a twelve-year-old boy to fellate him while several older boys were fellating him. There was evidence that defendant had been paying the boys for sex. He had a long prior criminal record, including attempted extortion, unlawful transportation of firearms, and three convictions for carrying a concealed weapon.

*People v Lyons*, No. 97414—Defendant, age forty, was sentenced to twenty-five to forty years for CSC I, and ten to fifteen years for robbery. He was convicted by a Calhoun Circuit Court jury for assaulting a sixteen-year-old boy on the street and robbing him of a nickel. Apparently angered by the meager amount, he pulled the boy off the sidewalk out of sight, pulled down the boy's pants and penetrated his anus with his finger. Lyons then attempted to engage in anal intercourse, but fled when he saw police. Lyons had one prior misdemeanor and three prior felony convictions, including one conviction each for CSC I and attempted CSC II.

[14] The defendant told the victim not to tell her mother. The victim eventually told her mother two years later, after the defendant and her mother had separated.

*People v Pierce,* No. 97510—Defendant, age twenty-seven, was sentenced to five to ten years. Defendant and his girlfriend regularly cared for the victim and her siblings. The defendant was found guilty by a Delta County jury of two counts of CSC I on evidence that he engaged in cunnilingus and intercourse with the victim on repeated occasions while her siblings were present in the same room.[15]

*People v Greer,* No. 97337—Defendant was sentenced to ten to twenty years. He was convicted of CSC I by a Marquette County jury on evidence that he forced the victim, the ten-year-old biological son of his wife, to engage in oral sex.[16]

*People v Brown,* No. 98195—Defendant was sentenced to three to twenty years for CSC I and three to fifteen years for CSC II. He was convicted by an Oakland County jury on evidence that he sexually assaulted his three-year-old daughter on two occasions.[17]

*People v Heath,* No. 97484—Defendant, age forty-four, was sentenced to fifteen to twenty-five years for convictions of CSC I and ten to fifteen years for CSC II. Defendant was convicted on a nolo contendere plea to six counts of CSC I and one count of CSC II in Oakland Circuit Court on evidence that he, a close family friend of the victim, had forced her, from the age of seven to the age of eleven, to engage in over 100 instances of forced oral, digital and vaginal penetration.

*People v Farnsworth,* No. 97849—Defendant was sentenced to four to ten years for a CSC I convic-

---

[15] Defendant had threatened the siblings if they told anyone.

[16] The victim was not living with his mother, but had been adopted by another family. There was also evidence that the defendant had engaged in an attempted sexual assault on the victim's five-year-old sister.

[17] There was some evidence that the defendant was engaged in paternity and support litigation with the victim's mother.

tion and four to fifteen years for CSC II. He was convicted in Detroit Recorder's Court on evidence that he sexually abused his stepdaughter over a period of years.[18]

*People v Parsons,* No. 100403—Defendant, age fifty-five, was sentenced to fifteen to thirty years. He was convicted in Eaton Circuit Court on a plea of guilty of one count of CSC I on evidence that he had his six-year-old granddaughter fellate him.[19]

*People v Glockzin,* No. 100473—Defendant, age twenty-one, was sentenced to seven and one-half to forty years. He was convicted of CSC I on a plea of guilty in Muskegon Circuit Court on evidence that he forced two victims, a five-year-old girl and her ten-year-old brother, to engage in oral sex.[20]

*People v Luckey,* No. 97530—Defendant, age twenty-eight, was sentenced to forty to eighty years for two CSC I convictions, and ten to fifteen years for a CSC II conviction. He was convicted by a Recorder's Court jury on evidence that he engaged in repeated vaginal intercourse with the eight-year-old daughter of his live-in girlfriend. As a result of these encounters, the victim suffered genital warts.

In the following cases, in addition to the close relationship with the victim, the defendant had a prior criminal record:

*People v Santos,* No. 97651—Defendant, age thirty-two, was sentenced to twenty-five to fifty years. He was convicted by an Ingham Circuit Court jury of two counts of CSC I on evidence that

[18] The allegations of abuse came to light after the defendant divorced the victim's mother.

[19] The defendant was charged with having two other granddaughters, eight and ten, perform similar acts, but those charges were dismissed in exchange for the guilty plea.

[20] The defendant was a neighbor of the victim's family and regularly performed babysitting services.

he anally and vaginally penetrated the two-year-old daughter of his live-in girlfriend.[21]

*People v Matthews,* No. 100501—Defendant was sentenced to fifteen to twenty-two and one-half years as a second felony offender. He was convicted following a Muskegon Circuit Court bench trial of one count of CSC III on evidence that he engaged in a regular pattern of sexual intercourse with his daughter since she was twelve.[22]

*People v Mott,* No. 100551—Defendant, age thirty-four, was sentenced to nine and one-half to fifteen years. He was convicted on a plea of guilty of one count of CSC II in the Saginaw Circuit Court on evidence that he molested the nine-year-old victim, who called him "Uncle John," while she stayed with him during her summer vacations from school.[23]

*People v Ricky Lee Walker,* No. 100542—Defendant was sentenced to fourteen to thirty years. He was convicted on a plea of guilty of one count of CSC I in Genesee Circuit Court on evidence that on numerous occasions, beginning when his stepdaughter was in the fourth grade and continuing until her thirteenth birthday, he forced her to perform fellatio and engage in vaginal intercourse.[24]

*People v Nelson,* No. 100534—Defendant, age nineteen, was sentenced to eleven to thirty years

---

[21] He had two prior misdemeanor convictions.

[22] The daughter, twenty at the time of trial, claimed that the defendant had digitally penetrated her starting at the age of six. The defendant had a history of prior convictions.

[23] On two occasions, the defendant put his hand inside her underwear and digitally penetrated her. There was also evidence that he sexually touched the victim's three-year-old sister. The defendant had a prior record of convictions for CSC I, CSC IV, and a misdemeanor.

[24] The sexual assaults ended when the stepdaughter's mother unexpectedly returned home and discovered the defendant sexually assaulting her daughter. Defendant had a prior criminal record, including a conviction for carrying a concealed weapon.

as an habitual offender. He was convicted by .a Washtenaw Circuit Court jury of one count of CSC I on evidence that he forced his five-year-old cousin to perform fellatio.[25]

*People v Corder,* No. 100519—Defendant, age fifty-five, was sentenced to twelve to twenty-two and one-half years. He was convicted by a Berrien Circuit Court jury of one count of CSC II on evidence that he engaged in sexual conduct with his mentally retarded twenty-four-year-old daughter.[26]

*People v Saunders,* No. 100500—Defendant, age forty-two, was sentenced to fifteen to thirty years. He was convicted on a plea of nolo contendere in the Kent Circuit Court on evidence that he attempted to have sexual intercourse with his ten-year-old daughter, and, when she resisted, performed cunnilingus and digitally penetrated her vagina, and then ejaculated.[27]

*People v Abernathy,* No. 100487—Defendant, age twenty-eight, was sentenced to life in prison. He was convicted in Detroit Recorder's Court of CSC I on evidence that he sexually assaulted the twelve-year-old daughter of the woman with whom he was living.[28]

The sentence imposed on Houston, who had no prior record, is disproportionate. I would reverse and remand for resentencing.

---

[25] The defendant had a prior conviction for larceny.

[26] The defendant had a prior CSC IV conviction, and a conviction for false pretenses involving less than $100.

[27] The defendant had a number of prior convictions, including CSC I, breaking and entering, and numerous misdemeanors.

[28] The defendant was on parole for a conviction of CSC III of a five-year-old girl.