# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JACOB DANIEL MCKAY,

      Defendant-Appellant.

UNPUBLISHED
March 6, 2018

No. 335417
Ingham Circuit Court
LC No. 15-001126-FH

Before: CAVANAGH, P.J., and HOEKSTRA and BECKERING, JJ.

PER CURIAM.

A jury convicted defendant, Jacob Daniel McKay, of three counts of second-degree child abuse, MCL 750.136b(3). The trial court sentenced him as a third habitual offender, MCL 769.11, to serve concurrent prison terms of 160 months to 240 months on each conviction, which exceeded by 31 months the top of the recommended minimum sentencing guidelines range of 43 months to 129 months. Defendant appeals as of right. For reasons more fully explained below, we affirm defendant's convictions, but vacate his sentence and remand for resentencing.

## I. RELEVANT FACTS AND PROCEEDINGS

The victims in this case were three of defendant's four stepchildren, JLB, JJB, and SLB.[1] The children were approximately ten, seven, and five years old when their mother married and moved in with defendant, and they lived with defendant for less than 16 months before Child Protective Services placed them with their paternal grandmother.[2] Prior to moving in with defendant, the children had resided for three years with their paternal grandmother, who testified

---

[1] The fourth stepchild was the youngest and it appears that because of her young age she was not subject to the same abuse as the older three children. She did not testify at trial and defendant was not charged with abusing her.

[2] The children's mother testified at defendant's trial that she took the children to their paternal grandmother's house for spring break in March 2013, and CPS placed them with the grandmother in April. The mother testified that she voluntarily released her parental rights to the children. She also testified that their biological father's parental rights were terminated at the same time as hers. The children were 14, 11, and 10 years old at the time of defendant's trial.

-1-

that the children were "happy" and "normal," although JJB had some behavior issues related to Attention Deficit Hyperactivity Disorder (ADHD).[3] The children's mother testified that defendant was unable to work because of a back injury, so he was the children's primary caregiver and disciplinarian while she was at work. All three children testified to various forms of punishment that defendant meted out. Their testimony was corroborated by that of defendant's biological children, who visited defendant every other weekend during the school year and alternate weeks during the summer. In addition, defendant corroborated much of the victims' testimony in his interview with Detective Shannon Thielen of the Lansing Police Department's Special Victims Unit.

All three victims testified that defendant made them stand in a corner and touch their toes without bending their knees. If they moved or complained, defendant would add time to the punishment. Although testimony regarding how long the children had to touch their toes varied, defendant admitted in his interview with Detective Thielen that he made them touch their toes for thirty minutes or an hour at a time. Another form of punishment defendant employed was to make the two oldest children write sentences, such as "I will not lie," "I will not steal," or "this is wrong because . . . ." The number of sentences assigned would accumulate as punishments were added for further misconduct. JLB testified that she was assigned hundreds or even thousands of sentences that would take her multiple days to write, and that she filled a three-subject college-ruled notebook with sentences in the roughly 15 months she lived with defendant. Two of defendant's biological children testified that they observed JLB have to write at least one thousand sentences due to cumulative punishments.

In addition, all three victims testified that defendant punished them by "grounding" them for long periods. JLB testified that the longest defendant grounded her was for 72 or 73 days, and SLB testified that she once was grounded for an entire summer. JLB testified that the groundings started with four or five days, but days were added if they "messed up." When grounded, defendant confined the children to their bedrooms, which contained little more than a bed and a blanket or sheet. JJB was allowed to have books, but his room did not have an interior doorknob, and defendant kept the exterior doorknob on his person and exercised control over when JJB could exit the room. SLB testified that she was able to look out her window until defendant covered it with a blanket, and that defendant would place a large dresser in front of her room to barricade her inside. The children had to ask permission to use the restroom, but testified that defendant did not always give permission. SLB, who was five years old at the time of the abuse, resorted to relieving herself in her room and hiding the evidence in a closet or under a bed. Defendant admitted to Detective Thielen that he once found the urine- and feces-soiled underwear and smeared them across SLB's face as punishment.

The jury also heard testimony that defendant spanked the children with his hand, a belt, plastic spatulas, or "whatever" he had nearby. Defendant's biological children testified that

---

[3] Between the time JJB lived with his paternal grandmother in 2011 and the time CPS removed him and his siblings from defendant's care in the spring of 2013, he also received a diagnosis of autism spectrum disorder.

defendant spanked JJB excessively and aggressively, sometimes making it hard for him to sit. JJB testified that defendant banged his head against the wall and once pushed him down the stairs, and JLB reported that she saw defendant hit JJB in the head with a jar. The jury also heard testimony that defendant verbally abused the children. JLB testified that defendant called her and JJB "worthless" and "stupid," and JJB said that defendant would yell and cuss at him. JLB also testified that she had a "smart mouth" and defendant would forbid her from talking for two, three, or four days at a time. One of defendant's biological children testified that he observed JLB, who was ten- or eleven-years-old at the time, do the cleaning and a majority of the cooking. All three children testified that food was not always freely available to them.

During her testimony, Detective Thielen read into the record some of defendant's statements from her interview with him, which corroborated much of what the children alleged. The jury heard that defendant blamed his behavior with the children on the mix of medications he was taking for his back injury and other ailments. He admitted to Detective Thielen that he caused the children trauma, that he made JLB do a lot of the cooking and cleaning and there were times he would not allow her to speak, and that he placed a dresser in front of SLB's bedroom door to keep her from escaping. He also admitted in the interview to wiping SLB's face with a pair of soiled underwear, and getting "some of it in her hair." He said he was "trying to instill the nastiness of it, but at the same time I just degraded her." Detective Thielen reported that defendant said, "it wasn't until after they were gone that I realized how bad it was with the discipline, the verbal and the mental instability, and the abuse going on."

Eventually, JLB disclosed what was happening to a school counselor because she was "getting fed up" and having suicidal thoughts. In March 2013, while a Child Protective Services (CPS) investigation was ongoing, the children's mother dropped the children off with their paternal grandmother. The next month, CPS officially placed the children with the paternal grandmother, who testified that, although the children appeared fine physically, they behaved differently when they came back under her care. For example, they flinched when hugged or touched. JLB was "leery of everyone," showed signs of "depression and guilt," and was self-harming, including cutting herself and biting her hands until they would bleed. JJB's moods had become "volatile," and SLB was "depressed," "very timid, frightened easily," and had "lots of nightmares." The grandmother sought counseling for the children, and they subsequently were diagnosed with post-traumatic stress disorder (PTSD). In addition, JLB was diagnosed with borderline personality disorder and major depression; she also engaged in self-harm and attempted suicide twice. Eventually, authorities removed JLB and JJB from their grandmother's home and placed them in a residential psychiatric facility. SLB's counselor testified that SLB's PTSD was improving and that she was hopeful that SLB might eventually lead a normal life, but concluded that SLB was still in need of ongoing weekly therapy.

The jury deliberated approximately four hours before returning guilty verdicts. At his sentencing hearing, defendant asked for mercy, told the court he was doing "everything [he] can to try and bless the people that come in contact with [him]," and that he was making amends by creating a non-profit organization for the homeless. In her victim's impact statement, JLB expressed how hard she had worked to be able to stand before the court, how difficult it was for her to do so, and how angry she felt. The trial court initially calculated defendant's minimum sentencing guidelines range for a class C offense at 50 months to 150 months for a third habitual offender. However, corrections made to defendant's prior record variable (PRV) score changed

his PRV level from D to C. Although the trial court also made corrections to defendant's offense variable (OV) score, his OV level remained at level VI. The result was a revised recommended minimum sentencing guidelines range of 43 months to 129 months. Defendant's attorney asked the court to impose a sentence at the mid to low level of the guidelines, while the prosecution asked the court to impose a 160-month minimum sentence, two-thirds of the maximum sentence allowed by statute. See MCL 750.136b(4)(b) (setting the maximum prison sentence for a second or subsequent second-degree child abuse offense at 20 years). The court granted the prosecution's request and sentenced defendant to 160 months to 240 months in prison. Defendant now appeals his conviction and his sentence.

## II. ANALYSIS

### A. REASONABLENESS OF SENTENCE

Defendant first argues that the trial court abused its discretion in imposing a departure sentence that was unreasonable and disproportionate. Defendant contends that his actions did not justify imposition of a sentence that exceeded by 31 months the high end of the recommended 43 to 129 month minimum sentence range because he expressed remorse, was making amends by helping the homeless, and demonstrated that he was capable of rehabilitation.

This Court reviews for reasonableness a trial court's decision to depart from the applicable sentencing guidelines range. *People v Steanhouse*, 500 Mich 453, 471, 476; 902 NW2d 327 (2017). When reviewing a departure sentence for reasonableness, we must review "whether the trial court abused its discretion by violating the principle of proportionality set forth in [*People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990)]." *Id*. at 477. A trial court abuses its discretion "in applying the principle of proportionality by failing to provide adequate reasons for the extent of the departure sentence imposed . . . ." *Id*. at 476.

The *Milbourn* Court described the principle of proportionality as one in which

a judge helps to fulfill the overall legislative scheme of criminal punishment by taking care to assure that the sentences imposed across the discretionary range are proportionate to the seriousness of the matters that come before the court for sentencing. In making this assessment, the judge, of course, must take into account the nature of the offense and the background of the offender. [*Milbourn*, 435 Mich at 651.]

" '[T]he key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range.' " *Steanhouse*, 500 Mich at 472, quoting *Milbourn*, 435 Mich at 661.

The Legislature incorporated this principle of proportionality into the sentencing guidelines. *People v Babcock*, 469 Mich 247, 263; 666 NW2d 231 (2003) (stating that the Legislature "subscribed to this principle of proportionality in establishing the statutory sentencing guidelines"). The Legislature enacted the sentencing guidelines "to promote uniform sentencing across the state." *People v Smith*, 482 Mich 292, 312; 754 NW2d 284 (2008). However, the guidelines were again made advisory by our Supreme Court's decision in *People v Lockridge*, 498 Mich 358, 391-392; 870 NW2d 502 (2015), in order to remedy the violations of

the Sixth Amendment that arose from court's imposing mandatory minimum sentences based on facts not found by juries or admitted by defendants. Although trial courts are no longer bound by the sentencing guidelines, they "must continue to consult the applicable guidelines range and take it into account when imposing a sentence." *Lockridge*, 498 Mich at 392; see also *People v Dixon-Bey*, __ Mich App __; __ NW2d __ (2017) (Docket No. 331499); slip op at 21-22. Although sentencing courts are no longer required to articulate "substantial and compelling reasons" for imposing a sentence that departs from the sentencing guidelines' recommendation, they still must "justify the sentence imposed in order to facilitate appellate review." *Lockridge*, 498 Mich at 392.

Appellate courts review departure sentences for reasonableness. *Id*. In *Steanhouse*, our Supreme Court resolved a division between panels of this Court concerning "the proper standard to use to determine whether a defendant's departure sentence is so unreasonable as to constitute an abuse of the trial court's discretion and warrant reversal on appeal." *Steanhouse*, 500 Mich at 471. In so doing, the *Steanhouse* Court reaffirmed "the proportionality principle adopted in *Milbourn* and reaffirmed in *Babcock* and *Smith*." *Id*. at 473. Accordingly, "appellate review of departure sentences for reasonableness requires review of whether the trial court abused its discretion by violating the principle of proportionality set forth in [the Supreme Court's] decision in *Milbourn*." *Id*. at 477. Further, a sentencing court can "abuse[] its discretion in applying the principle of proportionality by failing to provide adequate reasons for the extent of the departure sentence imposed." *Id*. at 476. When this occurs, the reviewing court must remand to the trial court for resentencing. *Id*.

In the present case, the trial court sentenced defendant to a minimum sentence of 160 months to 240 months, 31 months more than the sentencing guidelines' recommended minimum sentence range of 43 months to 129 months. The trial court explained its departure thusly:

You know, I don't usually say much, but I think my sentence is probably going to be reviewed at the higher level.

I would like the court of appeals to be aware that I am mindful of the rescored guidelines and the different level that is on that sheet. And I would say that, I wonder, Mr. [Prosecutor], how many of these kind of cases have I handled in the last 37 years? How many horrible deaths of babies and abuse and CSC? I remembered a guy, it was before your time, where he had been raping his own two daughters from the time they were six years old up till they were adults, and they came in and testified crying their eyes out. It just – these things just really are something else, and I don't understand what this world has gotten to.

Mr. [Prosecutor] makes a very good point.[4] [Defendant] had a right to exercise his constitutional rights to have a trial here. He had every right, and I

---

[4] According to the sentencing transcript, the prosecutor had earlier opined that he did not believe that the guidelines sufficiently encompassed the acts committed by defendant. Included was defendant's having put the children through two proceedings where they had to testify (the

respect that, and any decision I make has nothing to do with that. But you tell me how anyone can smear feces on a child's face and urine on their face and claim that that is normal childhood punishment? How can anyone do that to a little five year old girl, it is beyond me, and then sit here and expect those children – probably assuming they are not going to testify against him.

I don't know. There is something radically wrong in your client's mind, Counsel. There is a piece missing out of there. I think he is a psychotic psychopath. He is absolutely at the bottom. I have never had anybody – even the people who molested children didn't do the things this man has done. He has set a new level of bottom of the barrel for all of us.

They were three damaged children when he walked in, and between him and his wife, they managed to destroy all three of them. Two are in mental hospitals and the third one has to see a psychiatrist or psychologist almost every week. Their lives are in tatters. Whatever was left he has managed to take it and destroy it with her help. And she is – she stands there with him. It's absolutely amazing. If I had the ability to make sure that they never had other children I would order that, but I don't.

I want the court of appeals to recognize just what a horrible case it is. Whatever clerk over there reviews this needs to read the agent's description of the offense and the transcript of this trial.

The trial court expressly recognized that it was imposing a sentence that departed from the guidelines, and that its departure sentence was likely to be reviewed by this Court. Departure from the guidelines is "appropriate where the guidelines do not adequately account for important factors legitimately considered at sentencing." *Milbourn*, 435 Mich at 657. Factors a trial court may consider under the principle of proportionality standard include, but are not limited to the seriousness of the offense, factors inadequately considered by the guidelines, and factors not considered by the guidelines, such as the relationship between the victim and the perpetrator, the defendant's misconduct while in custody, expressions of remorse, and potential for rehabilitation. *People v Houston*, 448 Mich 312, 321-324; 532 NW2d 508 (1995). We evaluate not only the court's reasons for imposing the departure sentence, but also "whether the *extent* of the departure can satisfy the principle of proportionality." *Steanhouse*, __ Mich App __; __ NW2d __ (2017); slip op at 3; see *Milbourn*, 435 Mich at 659-660 (recognizing that "[e]ven where some departure appears to be appropriate, the extent of the departure (rather than the fact of the departure itself) may embody a violation of the principle of proportionality"). As already indicated, a trial court must justify the departure sentence to facilitate appellate review, *Lockridge*, 498 Mich at 392. This means that the court must articulate adequate reasons to support the fact of the departure as well as to justify the extent of the departure. See *Smith*, 482 Mich at 295.

---

preliminary examination and the trial) and then having "the gall to stand up here and talk about the good acts he has done."

While we agree with the trial court's characterization of this as "a horrible case" of child abuse warranting an accordingly proportionate sentence, we must vacate and remand for resentencing because the trial court's imposition of the maximum possible sentence was summarily lodged in subjective conclusions rather than objective findings that are capable of appellate review.[5] In doing so, the trial court "abused its discretion in applying the principle of proportionality by failing to provide adequate reasons for the extent of the departure sentence imposed." *Steanhouse*, 500 Mich at 476. The facts of this case are compelling. The record indicates that the two older children suffered from behavioral issues or a developmental disorder prior to defendant's abuse, and that defendant's abuse worsened their issues to the point that they required residential psychiatric care. Defendant's rubbing the five-year old child's face in underwear she soiled with feces and urine because defendant would not allow her out of her room to go to the bathroom was unimaginably cruel and degrading. Nevertheless, the offense variables that the trial court scored contemplated the vulnerability of the victims, the brutal and sadistic nature of defendant's actions, and the serious psychological harm suffered by the victims. Here, the trial court did not articulate whether or how the OVs inadequately accounted for these characteristics of defendant's offenses, what characteristics of defendant's offenses were not accounted for by the guidelines, or why a minimum sentence of 31 months above the maximum end of the recommended sentencing guidelines range satisfied the principle of proportionality. And while imposing a proportionate sentence does not require a presumption of unreasonableness for sentences outside the guidelines range, the guidelines remain highly relevant. See *Steanhouse*, 500 Mich at 475.

As to the characteristics of the offense, the trial court scored OV 10 (exploitation of a vulnerable victim), MCL 777.40, at 10 points, indicating that defendant had exploited the victims' physical or mental disabilities, their youth, or his status as their stepfather. Although the trial court stressed that the victims were "damaged" when defendant became their stepfather, the court offered no rationale as to why OV 10 inadequately accounted for their particular degree of vulnerability or the magnitude of defendant's abuse of his authority. Likewise, the trial court assessed the maximum 10 points for OV 4 (psychological injury to victim), MCL 777.34, because "serious psychological injury requiring professional treatment occurred to a victim." The trial court noted that defendant's abuse caused JLB and JJB to be placed in residential psychiatric facilities, and required SLB to undergo weekly psychiatric care. However, the trial court did not indicate whether or how OV 4 was inadequate to account for the degree of psychological harm suffered by the victims. In like fashion, the trial court assessed a maximum of 50 points for OV 7 (aggravated physical abuse), MCL 777.37, which is proper where a "victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." In addition to the trial court's reference to defendant's smearing SLB's face with her feces-and-urine-soiled underwear, trial testimony indicated that defendant left the children in stress positions for considerable periods and grounded them under harsh conditions for weeks—and even months—

---

[5] Concluding that defendant "has a piece missing" and instructing the clerks of this Court to review the record so that we might come to the same conclusion is simply insufficient.

-7-

at a time. The trial court offered no rationale as to why scoring OV 7 at 50 points was insufficient to account for the nature of defendant's abuse.

Turning to the nature of the offender, defendant's prior record variable (PRV) score was 22. The trial court scored two points for PRV 5 (prior misdemeanor convictions), MCL 777.55, for a 2010 domestic assault conviction in violation of MCL 750.81(2), and 20 points for PRV 7 (subsequent or concurrent felony convictions), MCL 777.57, to reflect that a jury convicted defendant of three counts of second-degree child abuse. Apart from this, defendant had two very old non-violent felonies. Although the trial court might factor in defendant's recent domestic assault, followed by the convictions for second-degree child abuse, when considering defendant's potential for rehabilitation, the trial court did not point to anything in defendant's background indicating recidivist proclivities that would make a departure sentence more proportionate than a sentence within the guidelines.

The trial court urged this Court to review the record closely and "recognize just what a horrible case it is." However, regardless of the closeness of our review, if the trial court fails to provide an adequate explanation for the fact and extent of a departure sentence, this Court cannot supplement the trial court's reasoning with its own. *Smith*, 482 Mich at 304 ("[I]f it is unclear why the trial court made a particular departure, an appellate court cannot substitute its own judgment about whey the departure was justified"); see also *People v Dixon-Bey*, __ Mich App __; __ NW2d __ (2017) (Docket No. 331499); slip op at 21. Nor can we uphold a sentence "when the connection between the reasons given for departure and the extent of the departure is unclear." *Smith*, 482 Mich at 304. Even if we were inclined to conclude that the trial court's implication that the seriousness of defendant's offenses exceeded that contemplated by the sentencing guidelines adequately explained why the court imposed a departure sentence, nothing in the court's comments articulates objective grounds for the particular extent of the departure. Because we conclude that the trial court abused its discretion in applying the principle of proportionality by "failing to provide adequate reasons for the extent of the departure sentence imposed," we must remand the matter to the trial court for resentencing.[6] *Steanhouse*, 500 Mich at 476. In light of our disposition of this issue, we need not address defendant's claim that his sentence constituted cruel and unusual punishment.

B. STANDARD 4 BRIEF

1. INEFFECTIVE ASSISTANCE OF COUNSEL

---

[6] At the time of resentencing, if the trial court deems a departure sentence to be proportionate to the offender and the offenses, it would behoove the court for appellate review purposes to address the facts of this case in the context of the objective factors a court may consider, several of which are addressed in *Houston*, 448 Mich at 321-324.

In a Standard 4 brief,[7] defendant argues that he received ineffective assistance of counsel at trial. We disagree. Defendant did not preserve this claim by making a motion for a new trial or for a *Ginther*[8] hearing. *People v Lopez*, 305 Mich App 686, 693; 854 NW2d 205 (2014). Unpreserved claims of ineffective assistance of counsel are reviewed for errors apparent on the record. *Id.* "If the record does not contain sufficient detail to support defendant's ineffective assistance claim, then he has effectively waived the issue." *People v Lockett*, 295 Mich App 165, 186; 814 NW2d 295 (2012) (quotation marks and citation omitted).

Criminal defendants have the right to effective assistance of counsel at trial. US Const, Am VI; Const 1963, art 1, §20; *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012). Effective assistance is presumed, and a defendant bears a heavy burden of proving otherwise. *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009). In order to establish ineffective assistance of counsel, a defendant must show that " 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Vaughn*, 491 Mich at 669, quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). A reviewing court should consider counsel's performance with the strong presumption that adequate assistance was rendered and that all decisions made were in the "exercise of reasonable and professional judgment." *Vaughn*, 491 Mich at 670 (quotation marks and citation omitted). Further, the Court should not substitute its judgment with the benefit of hindsight on decisions made by counsel regarding matters of trial strategy. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009).

Defendant first argues that his counsel was ineffective because of a question he asked during jury voir dire. Counsel inquired whether the jury had ever seen a popular television show in which the father sometimes "swats" his children on the back of the head as punishment. Presumably, counsel was attempting to analogize defendant spanking his children to the depiction on the television show as a way to gauge the potential juror's opinions on physical punishment. "The function of voir dire is to elicit sufficient information from prospective jurors to enable the trial court and counsel to determine who should be disqualified from service on the basis of an inability to render decisions impartially." *People v Sawyer*, 215 Mich App 183, 186; 545 NW2d 6 (1996). Acceptability of voir dire practices "does not lend itself to hard and fast rules." *Id.*, quoting *People v Tyburski*, 445 Mich 606, 623; 518 NW2d 441 (1994). Questioning should focus on "discovering grounds for challenges for cause and of gaining knowledge to facilitate an intelligent exercise of peremptory challenges." MCR 6.412(C)(1). The question posed was within the proper scope and purpose of voir dire. Moreover, defendant cannot show that this question caused prejudice, nor does he offer any argument to overcome the presumption that this was sound trial strategy. *Payne*, 285 Mich App at 190.

---

[7] A "Standard 4" brief refers to the brief a defendant may file *in propria persona* pursuant to Standard 4 of Michigan Supreme Court Administrative Order No. 2004-6, 471 Mich c, cii (2004).

[8] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Next, defendant argues that the trial judge's admonishment of his attorney for failing to make an objection constituted ineffective assistance of counsel. Defendant does not point to where in the record this admonishment took place, or explain how this fell below an objective standard of reasonableness or affected the ultimate outcome of the proceeding. *Vaughn*, 491 Mich at 669. An appellant is required to argue the merits of each issue, see *People v King*, 297 Mich App 465, 474; 824 NW2d 258 (2012), and to support factual statements with specific references to the record, *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008). Accordingly, this argument is waived. *Id.* In any event, even if defendant had pointed to a particular missing objection, whether to raise an objection is a matter of trial strategy. *People v Unger (On Remand)*, 278 Mich App 210, 242-243; 749 NW2d 272 (2008).

Defendant finally argues that defense counsel failed to impeach witnesses or attack witnesses as uncooperative or not credible. Whether and how to cross-examine witnesses is a matter of trial strategy. *People v Hopson*, 178 Mich App 406, 412; 444 NW2d 167 (1989). A defendant can only prove counsel was ineffective by a failure to cross-examine a witness if the failure deprives the defendant of a substantial defense. *Id.* A substantial defense is one that may have affected the outcome of the trial. *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009).

First, defendant has not supported his claim by identifying which witnesses his counsel failed to cross-examine, when he failed to impeach witnesses, or what questions he should have asked. Therefore, he has failed to establish the factual predicate for his claim. See *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014). The record shows that defense counsel impeached witnesses on multiple occasions, attacked witness credibility, and argued that witnesses were not credible in his closing argument. Defendant was not deprived of a substantial defense. *Hopson*, 178 Mich App at 412.

Finally, defendant argues that his counsel did not sufficiently "show the flaws in the case." Again, defendant fails to support this factual assertion and it is not the responsibility of this Court to rationalize his position. See *King*, 297 Mich App at 474. Furthermore, there was ample evidence to convict defendant, including testimony from all three of his stepchildren and his three biological children, as well as his own statements given to law enforcement.

Defendant fails to overcome the strong presumption that effective assistance was rendered and that his attorney acted in accordance with sound trial strategy. *Payne*, 285 Mich App at 190. He also cannot show that he was prejudiced by any of the alleged errors. *Vaughn*, 491 Mich at 669. Accordingly, his claim of ineffective assistance of counsel fails.

## 2. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that the trial court should have declared a mistrial because of "reasonable doubt." We disagree.

Due process requires that the prosecution introduce sufficient evidence on each element of an offense to justify a verdict that a defendant is guilty beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 513-514; 489 NW2d 748, amended on other grounds, 441 Mich 1201 (1992). Under MCL 750.136b(3),

(3) A person is guilty of child abuse in the second degree if any of the following apply:

\* \* \*

(b) The person knowingly or intentionally commits an act likely to cause serious physical or mental harm to a child regardless of whether harm results.

(c) The person knowingly or intentionally commits an act that is cruel to a child regardless of whether harm results.

The prosecution offered both MCL 750.136b(3)(b) and (c) as alternative theories for the charge of second-degree child abuse. First, the prosecution argued that defendant knowingly and intentionally committed an act likely to cause serious physical or mental harm to the children. MCL 750.136b(3)(b).

Serious mental harm means an injury to a child's mental condition or welfare that is not necessarily permanent but results in visibly demonstrable manifestations of a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life. [MCL 750.136b(1)(g).]

Alternatively, the prosecution theorized that defendant knowingly or intentionally committed cruel acts toward his stepchildren. Under the statute, a "cruel" act is one that is "brutal, inhuman, sadistic, or that which torments." MCL 750.136b(1)(b).

The jury heard testimony that defendant locked the children in their rooms for extended periods and physically and mentally abused them. In his own statements, defendant openly admitted that he "caused a lot of trauma" and acknowledged, "how bad it was with the discipline, the verbal and the mental instability, and the abuse going on." It was established that all three children were diagnosed with PTSD as well as other serious mental illnesses after living with defendant, although before living with defendant they were "happy" and "normal." Thus, viewed in the light most favorable to the prosecution, there was sufficient evidence for the trier of fact to find that defendant intentionally committed acts that were likely to (and did) result in serious mental harm to the children, or that alternatively, he committed acts toward them that were cruel. MCL 750.136b(3)(b),(c).

Furthermore, the jury heard testimony about acts committed against the children that a jury could reasonably find were "cruel." This included locking the children in their rooms, placing them in stress positions for long periods of time, excessive physical punishment, forcing them to write thousands of sentences, and rubbing excrement in one of the children's faces. Viewed in the light most favorable to the prosecution, this was a sufficient amount of evidence for a reasonable jury to find that defendant knowingly committed "brutal, inhuman, sadistic" acts against the children. MCL 750.136b(1)(g).

Finally, defendant's assertion that a mistrial should have been declared because of "reasonable doubt" is without merit. A mistrial is appropriate when "there is a manifest necessity for the act, or the ends of the public justice would otherwise be defeated." *People v*

-11-

*Little*, 180 Mich App 19, 23; 446 NW2d 566 (1989), quoting *United States v Perez*, 22 US (9 Wheat) 579, 580, 6 L Ed 165 (1824). Defendant has not established manifest necessity or any public justice that would have been served by the declaration of a mistrial. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give an issue only cursory treatment with little or no citation of authority." *People v Bosca*, 310 Mich App 1, ; 871 NW2d 307 (2015) (quotation marks and citation omitted).

Accordingly, we affirm defendant's convictions, vacate his sentence, and remand the matter for resentencing consistent with this opinion. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Joel P. Hoekstra
/s/ Jane M. Beckering